[Cite as *State v. Conner*, 2014-Ohio-601.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99557**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTHONY CONNER

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-566159

**BEFORE:** McCormack, J., E.A. Gallagher, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** February 20, 2014

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Jesse Canonico
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

{¶1} Defendant-appellant, Anthony T. Conner, appeals his conviction and sentence for aggravated murder, murder, felonious assault, discharge of a firearm on or near prohibited premises, and having a weapon while under disability. After a thorough review of the record, we affirm Conner's convictions and sentence.

**Procedural History**

{¶2} On September 19, 2012, Conner was charged under a multi-count indictment as follows: (1) Count 1 — aggravated murder of Damon D. Woodard; (2) Count 2 — murder of Damon D. Woodard; (3) Count 3 — felonious assault of Damon D. Woodard; (4) Count 4 — felonious assault of Damon D. Woodard; (5) Count 5 — attempted murder of Marquis Hollowell; (6) Count 6 — felonious assault of Marquis Hollowell; (7) Count 7 — felonious assault of Officer Nikolai Przybylski; (8) Count 8 — discharge of firearm on or near prohibited premises; and (9) Count 9 — having weapons while under disability. Count 9 was bifurcated and the remaining charges proceeded to a jury trial. All counts, with the exception of Count 9, included one- and three-year firearm specifications.

{¶3} Over the defense's objections, the trial court found Marquis Hollowell competent to testify. During the course of the proceedings, Conner moved for mistrial four times, all of which the trial court denied. The trial court granted Conner's Crim.R. 29

motion for acquittal on Counts 5 and 6 (attempted murder and felonious assault of Hollowell), and it denied his motion as to the remaining counts.

{¶4} The jury found Conner guilty of Counts 1, 2, 3, 4, and 8, and not guilty of Count 7. The court found Conner guilty of bifurcated Count 9. For sentencing purposes, Counts 2, 3, and 4 were merged with Count 1. The court imposed the following sentence: life on Count 1 (with possible parole at 30 years); three years on the firearm specification; and six and one-half years on a probation violation on a different case. The court ordered this sentence to be served consecutively. The court sentenced Conner to eight years on Count 8 and three years on Count 9 and ordered that sentence to be served concurrently. Conner is eligible for parole after 39½ years.

### Substantive Facts

{¶5} Conner's convictions arose out of events that occurred following altercations at the Sirrah House, a nightclub with a history of fights, shots being fired, and assaults. The Cleveland nightclub, located on Lee Road, between Judson Drive and Lotus Drive, is routinely patrolled by Cleveland police officers. The following is a summary of the pertinent evidence the state presented at trial.

{¶6} On the evening of August 20, 2012, during routine patrol, Officers Antonio Curtis and Mister Jackson observed a fight break out at the entrance of the club within minutes of their arrival on the scene. The officers testified that it appeared that the club's security was attempting to push a large, fighting crowd out of the bar and away from the entrance. The officers attempted to disperse those who were involved in the multiple

fights that had pervaded the Sirrah House parking lot and nearby streets. Due to the number of fights and the size of the crowd, Officer Curtis radioed for assistance. Officer Nikolai Przybylski and his partner, Officer Katrina Ruma, responded to the call for back-up.

{¶7} Officer Przybylski, responding to the call with lights and sirens activated, parked his patrol car near the intersection of Judson Drive and Lee Road. Officer Przybylski testified that upon his arrival, he witnessed a large amount of pedestrian and vehicular traffic in the area. He observed "at least a hundred" people on the scene who were "all over the place." He further stated that there was a lot of arguing and "[e]verybody was yelling at each other." Once the crowd began to clear, he observed a young, black male in a white t-shirt lying on the ground holding his head and another black male standing next to him, on the "edge of the driveway apron," wearing blue jeans and a long-sleeved red plaid shirt. Officer Przybylski testified that the red shirt stood out in his mind because it "seemed very strange" that someone was wearing a long-sleeved shirt in the summer.

{¶8} Officer Przybylski further testified as follows: The male with the red plaid shirt pulled a gun out of the waistband of his pants. Officer Przybylski saw the muzzle of the gun as the male with the red shirt pointed the gun in the direction of his zone car. The male then shot two to three times in the direction of his car. At the time, Officer Przybylski was still seated in his car, with the window down. Officer Przybylski stated that despite approximately "a dozen people meandering" between his car and the shooter,

he had "a clear, unobstructed view" of the shooter and "no one was in [his] line of vision." Officer Przybylski stated that the commercial area was well lit and he was able to see the shooter's face and identify the gun as a .45-caliber "two-tone[d] * * * black and chrome or black and silver" handgun. Officer Przybylski testified that it appeared that the shooter was looking at him and his partner and was shooting at them.

{¶9} When Officer Przybylski observed the shooter shooting in the direction of the patrol car, he removed his gun from his holster and exited his vehicle. While exiting the vehicle, Officer Przybylski, maintaining eye contact with the shooter, saw the shooter "pivot" and move from facing the officer to moving to the shooter's right. Officer Przybylski stated that he then saw the muzzle again come up and saw the shooter fire another three to four shots while facing north and west at an angle. He began to run towards the shooter. He stated that after the first round of shots, the crowd cleared considerably. He proceeded to chase the shooter. During the chase, he repeatedly yelled at the shooter to stop and drop the gun. He observed the shooter run in between cars, "dip[] down or crouch[] down" near a "dark-colored car" and "almost immediately pop[] back up" facing him. While continuing to chase the shooter, he saw the shooter's arms "coming up at the waist." Believing the shooter would shoot him, Officer Przybylski fired at him. Officer Przybylski testified that after he shot at the shooter, the shooter turned away from him and proceeded in a southeast direction toward Judson Drive, where the foot chase continued and Officer Przybylski fired a second shot at the shooter.

**{¶10}** Officer Curtis testified that he heard gunshots and proceeded toward the sound of the gunshots, where he observed Officer Przybylski chasing a male in the area of Judson Drive. He then joined Officer Przybylski in the pursuit. Officer Przybylski, seeing Officer Curtis approach, advised Officer Curtis that the male he was chasing was the shooter. Both officers observed the shooter run in between houses, and as they lost sight of him, they heard the rattling of a fence behind a house. They no longer heard the shooter's footsteps. The officers discovered the shooter lying between a fence and a garage, with his hands under his backside. Observing him rustle his hands under his backside, the officers yelled for the shooter to stop and to show his hands. Officer Przybylski picked up the suspect, and both officers handcuffed him. The officers found keys, a cell phone, and a driver's license on the ground where the shooter had been lying. They did not, however, find a gun. The officers later learned that a gun had been located.

**{¶11}** The officers placed the shooter under arrest. During that time, the shooter denied any involvement in the shooting. Rather, he stated that he had a twin wearing the exact same outfit — blue jeans and a red plaid long-sleeved shirt.

**{¶12}** Officer Przybylski positively identified Conner as the individual who fired shots at him shortly after he arrived on the scene and the same person who was carrying the handgun while running away from him. He also identified the state's exhibit Nos. 61 and 62, a red plaid shirt and a pair of blue jeans, with one hundred percent certainty, as the clothing the shooter was wearing that same evening. Officer Przybylski testified that

he did not observe any other individual that evening wearing anything similar to the red plaid shirt he identified as the shirt the shooter was wearing.

{¶13} Officers Daniel Dickens and Sarene Saffo, who also responded to the call for assistance at the Sirrah House, observed a parking lot full of cars and people on the sidewalk and crossing the street. They heard gunshots shortly after arriving on the scene. Both officers observed the shooter. Officer Dickens testified that he saw a black male with a short haircut, wearing a red, long-sleeved shirt, shooting northbound. Both officers identified state's exhibit No. 61 as the shirt the shooter was wearing on the evening in question. The officers also identified Conner as the shooter who was wearing that red, long-sleeved shirt. Officers Dickens and Saffo, who also joined in the chase with Officers Przybylski and Curtis, testified that they observed the shooter running in between the cars and then southbound to the sidewalk on Judson Drive. They stated that they only lost sight of the shooter for a brief moment when the shooter ducked down by a parked car, until he popped back up and continued to run out of the parking lot.

{¶14} Following the shooter's arrest, Officers Dickens and Saffo returned to the parking lot where they had last seen the shooter with a gun. They testified that they discovered a black and silver handgun on the ground in the parking lot where they had observed the shooter duck down between cars and pop back up. The officers identified state's exhibit No. 60, the .45 caliber Kimber semiautomatic firearm, as the gun that they discovered in the parking lot and the same one they saw the shooter running with and

firing. Officer Przybylski also identified state's exhibit No. 60 as the gun he saw the shooter firing.

{¶15} Officer Ruma, who initially arrived on the scene with Officer Przybylski, heard gunshots while she attempted to control the large crowd that had dispersed throughout the streets and parking lots. She then observed Officer Przybylski exit the zone car and run towards Judson Drive. She radioed for back-up and exited the vehicle. She testified that while on the sidewalk just north of Judson Drive, she heard a second round of gunshots and observed Officers Przybylski, Dickens, and Saffo chasing a black male. Shortly thereafter, Officer Ruma observed a male who was bleeding from the chest lying on the ground of the parking lot near Lee Road, with an apparent gunshot wound. She called for an ambulance and attempted to provide some medical assistance to the victim. Officer Ruma testified that she and Officer Jackson also attempted to control a large, angry crowd that had surrounded them and the victim.

{¶16} The victim, identified as Damon D. Woodard, died from his injuries. Deputy medical examiner, Dr. Andrea McCollum, conducted the autopsy and concluded that Mr. Woodard died from multiple gunshots: one to his chest, one to his right arm, and one to his right knee. She recovered a bullet from a penetrating wound in Mr. Woodard's knee.

{¶17} Detective James Raynard collected several items from the crime scene, including the black and gray .45 caliber Kimber firearm and six .45 spent shell casings. He testified as to the locations throughout the parking lot and on the sidewalk

where the shell casings were discovered. He stated that one of the casings was discovered on the south sidewalk of the parking lot near the driveway on Judson Drive. Detective Raynard also collected a suspected bullet fragment and scattered broken automobile glass located in and around a sport utility vehicle parked in the southwest corner of the parking lot.

{¶18} Detective Todd Clemens performed a gunshot residue test on Conner's hands and processed the firearm for fingerprints. No fingerprints, however, were found on the weapon. Forensic scientist Lisa Przepynszy analyzed the gunshot residue test and reported that no gunshot residue was found on Conner's hands. Ms. Przepynszy also collected gunshot residue samples from Conner's shirt and found no evidence of gunshot residue on the cuffs of Conner's shirt. Ms. Przepynszy testified that the absence of gunshot residue is indicative of an individual not having discharged a firearm; however, due to the ease with which gunshot residue can be removed or lost from a surface, a negative result can occur from circumstances such as washing, other contact with hands, wind, rain, running, or sweating.

{¶19} Ms. Przepynszy analyzed the victim's clothing for blood, defects indicating a bullet hole, and gunshot residue such as fouling and bullet wipe. State's exhibit No. 69 was identified as a yellow shirt belonging to Woodard and the state's exhibits Nos. 27 through 31 were identified as close-up photographs of Woodard's yellow shirt. In examining Woodard's shirt, Ms. Przepynszy determined that the muzzle to target distance was approximately two to four feet, an intermediate range.

{¶20} Detective James Kooser, an expert in firearms and toolmark examination, testified that he examined the .45 caliber Kimber firearm that was discovered from the crime scene and determined that the firearm was operable. He also examined the six spent cartridge casings collected from the crime scene. He determined that all six casings were fired from the .45 caliber Kimber firearm that was discovered at the scene. Finally, Detective Kooser examined the bullet that Dr. McCollum removed from the victim's knee during the autopsy, known as the morgue bullet. He determined that the morgue bullet was fired by the same .45 caliber Kimber pistol.

{¶21} Deandre Stephens, a friend of Conner's, testified that he has known Conner for approximately ten years and they are good friends. He testified that, on the night in question, he and Conner went to the Sirrah House. Stephens borrowed his girlfriend Erica Stevenson's blue Pontiac G6. Stephens testified that Conner drove the G6 to the Sirrah House and parked it in the parking lot on Lee Road. While at the Sirrah House, Stephens and Conner met up with Stephens's cousin, Sharda Elmore, and friends Jeremy Milner and Brandon Crawford.

{¶22} Stephens testified that a fight broke out at the Sirrah House and the club's disc jockey made them leave. He stated that he got in a car with Elmore, and Elmore began to drive away, but he stopped the car because he thought their friend Crawford had been shot. At this point, Stephens's testimony begins to conflict with the statements Stephens made during a police interview on August 21. The court granted the state's request to treat Stephens as a hostile witness.

{¶23} Brandon Crawford, a friend of Conner's, testified that he saw his friends, Elmore, Milner, and Conner at the Sirrah House. He stated that he "grew up with them" and knew them from the neighborhood. Crawford stated that while in the Sirrah House, a fight broke out in which someone swung at him. The fight continued outside of the club where Crawford "got hit with something," and someone "stomped [him] to sleep." Crawford testified that a friend then dragged him across the street and set him by a police car where he remained unconscious "for about five minutes." He further testified at trial that if someone were to fight him, his friends would help him.

{¶24} Sharda Elmore testified that Conner is "like a brother" to him, referring to him as "Ant." He and Conner have known each other throughout "childhood and adult life" from the neighborhood. Elmore testified that he was joining his friends, Conner, Crawford, Stephens, and Milner at the Sirrah House. He also testified that "the Benham boys" were fighting. He identified Marquis Hollowell as one of the Benham boys and stated that Hollowell has a "pending case" with his girlfriend.

{¶25} Elmore testified that he witnessed Hollowell and Milner "having words." He attempted to intervene and that is when the altercation escalated. Elmore stated that Hollowell and "six other guys" were in front of him in the bar, Milner and Crawford were standing on either side of him, and Conner, Stephens, and another friend were standing behind him. Following an exchange of words between Hollowell and Elmore, one of the Benham boys in a yellow shirt and dreads threw a punch at Elmore and they "got to tussling." Security then broke up the fight and escorted Hollowell's group outside,

followed by Elmore and his group. Elmore testified that he and his friends were separated and he continued fighting in the parking lot with "some other guys" that were with Hollowell. He further testified that he was eventually surrounded by Hollowell and approximately 50 other people with Hollowell in the area when he saw Crawford lying on the ground hurt. Elmore was eventually smacked with a gun by one of the Benham boys and knocked unconscious. He was later treated for a broken jaw.

{¶26} Marquis Hollowell, a friend of Damon Woodard's, was present on the night in question and was interviewed by Detective Raymond Diaz on the scene and later at the police station. Hollowell had been declared incompetent to stand trial in his own defense on a different matter; however, following a competency hearing in this matter, the trial court found him competent to testify.

{¶27} Detective Diaz testified that Hollowell made a spontaneous statement on the scene that Conner had shot Woodard. At trial, however, Hollowell claimed a complete lack of memory of the incident. He was therefore called as a court's witness. Hollowell's videotaped statement to Detective Diaz was played during his testimony for impeachment purposes.

{¶28} Divard Jones, the manager of the Sirrah House, was working the evening of August 20, 2012. He testified that on the night in question, there were two off-duty Cleveland police officers working security detail at the club. He further testified that, prior to entering the club, everyone is subject to a pat-down for weapons or potentially harmful objects by the officers working security at the door. Jones stated that he

witnessed an altercation in the club around closing time and ushered the people outside, "contain[ing]" the inside of the club.

## Assignments of Error[1]

I.  The trial court erred by denying Appellant's motion for a mistrial.

II. The trial court erred by finding Marquis Hollowell competent to testify, by finding him a hostile witness and by allowing the state to play Hollowell's prior recorded statements to the jury in violation of Appellant's due process right to a fair trial and his constitutional right to confrontation.

III. Appellant's convictions were not supported by sufficient evidence and the trial court erred by denying his motions for acquittal.

IV. The convictions were against the manifest weight of the evidence.

V. The improper comments made during closing arguments amounted to plain error and/or counsel's failure to object to them denied Appellant his constitutional right to effective assistance of counsel.

VI. The trial court erred by imposing consecutive sentences and by failing

to merge all allied offenses of similar import.

## Testimony of Marquis Hollowell

{¶29} Conner contends in his second assignment of error that the trial court erred in allowing Marquis Hollowell to testify.  He claims that the court erred in finding Hollowell competent to testify, declaring him a hostile witness, and allowing the state to play Hollowell's prior recorded statements to the jury.

Witness Competency

---

[1]For ease of discussion, the assignments of error will be addressed out of sequence.

**{¶30}** Conner first argues that the trial court erred in finding Hollowell competent to testify as a witness when he was deemed incompetent to stand trial in his own defense. In support of his argument, Conner submitted a competency report prepared by psychologist Dr. Jennifer Franklin, dated October 15, 2012, in which Dr. Franklin opined that Hollowell suffers from "mild mental retardation" with a full scale IQ of 59 and a mood disorder.

**{¶31}** The determination of witness competency is within the sound discretion of the trial judge. *State v. Penque*, 8th Dist. Cuyahoga No. 99209, 2013-Ohio-4696, ¶ 25, citing *State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483 (1991). "'The trial judge, who saw the [witnesses] and heard their testimony and passed on their competency, was in a far better position to judge their competency than is this court, which only reads their testimony from the record * * *.'" *State v. Bradley*, 42 Ohio St.3d 136, 141, 538 N.E.2d 373 (1989), quoting *Barnett v. State*, 104 Ohio St. 298, 301, 135 N.E. 647 (1922). We therefore review the trial court's decision for an abuse of discretion, which implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶32}** Evid.R. 601(A) provides that every person is competent to be a witness except "[t]hose of unsound mind * * *, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

{¶33} The term "unsound mind" includes all forms of mental retardation. R.C. 1.02(C); *State v. Sanders*, 8th Dist. Cuyahoga No. 86405, 2006-Ohio-809. Being of unsound mind, however, does not automatically render a witness incompetent to testify. *Bradley* at 140. "'A person, who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind.'" *Id.* at 140-141, quoting *State v. Wildman*, 145 Ohio St. 379, 61 N.E.2d 790 (1945), paragraph three of the syllabus.

{¶34} Moreover, competency under Evid.R. 601(A) contemplates several characteristics: (1) the individual must have the ability to receive accurate impressions of fact; (2) the individual must be able to accurately recollect those impressions; and (3) the individual must be able to relate those impressions truthfully. *State v. Grahek*, 8th Dist. Cuyahoga No. 81443, 2003-Ohio-2650, ¶ 25, citing *State v. Said*, 71 Ohio St.3d 473, 644 N.E.2d 337 (1994).

{¶35} As Conner correctly notes, the test for incompetency to stand trial and the test to determine the competency of a witness to testify are not the same. *State v. Strickland*, 2d Dist. Montgomery No. 10968, 1988 Ohio App. LEXIS 5118 (Dec. 20, 1988). In *Strickland*, the witness was considered "moderately mentally retarded" and had been previously determined incompetent to stand trial. He was called as a witness to testify against Strickland. Prior to trial, Strickland challenged the witness's competency to testify. The trial court conducted a competency hearing and determined that the

witness was competent to testify, finding that he was capable of discerning between the truth and a lie and of appreciating the importance of telling the truth. In upholding the decision of the trial court, the court of appeals noted that the expert witness articulated her reasons why her findings that the witness was competent to testify were not inconsistent with her previous opinion that he was incompetent to stand trial on unrelated criminal charges. *Id*. at *9.

> Although evidence that a proposed witness is incompetent to stand trial is relevant on the issue of whether he is also incompetent to testify as a witness, a finding that the witness is incompetent to stand trial as an accused does not necessarily preclude a finding by the court that the witness is competent to testify.

*Id*.

{¶36} Here, the trial court conducted a competency hearing of Marquis Hollowell during which the court, the prosecutor, and the defense attorney questioned him regarding his name, age, family members, level of education, and his understanding of why he was in court. He knew the year, but did not know the date, the month, or the season. He told the judge that he finished the 11th grade, but he cannot read.

{¶37} When asked about his family members, Hollowell identified three brothers and three sisters, as well as their names and ages. He knew that he arrived in jail on August 23, his birthday, and stated that he had been in jail for about four to five months. When the prosecutor asked Hollowell if he had been in jail that entire time, he told the prosecutor that he "went to Northcoast for a month and a half." When asked what the case is about, he replied, "My friend getting killed" and correctly identified the

victim, Damon Woodard. He was able to recall some of the events of the night in question. When asked if he saw the person who shot Woodard, however, Hollowell replied, "Yes, but I start[ed] taking medications * * * and I don't remember nothing that happened that night."

{¶38} During the hearing, Hollowell stated that he understood he must tell the truth in court. He further demonstrated that he knew the difference between the truth and a lie.

{¶39} Following the hearing, the trial court reviewed the psychologist's report and determined that the report did not address Hollowell's ability to receive just impressions and to testify in this matter. Rather, the report addressed Hollowell's ability to understand abstract concepts and assist in his own defense. The court further noted that the report indicated that Hollowell's understanding of the roles of the prosecutor and the judge improved with some education and the doctor found that Hollowell "could be restored to competence within the time period allowed."

{¶40} After reviewing the psychologist's report, the trial court concluded, based on Hollowell's behavior, his answers at the hearing, and the psychologist's report, that Hollowell was competent to testify.

{¶41} A review of Hollowell's testimony indicates that he was able to perceive, recollect, and relate facts truthfully. Although he was unable to recall some of the incident, "imperfect recollection goes to the credibility of a witness; it does not, in itself, render a witness incompetent." *Sanders*, 8th Dist. Cuyahoga No. 86405, 2006-Ohio-809,

at ¶ 14. As such, we cannot find that the trial court abused its discretion in finding Hollowell competent to testify.

Court's Witness

{¶42} Conner also argues that the trial court erred when it allowed the state to treat Hollowell as a hostile witness and allowed the state to play Hollowell's videotaped statement to the jury. We note, however, that the state did not treat Hollowell as a hostile witness. Rather, the court called Hollowell as a court's witness in accordance with Evid.R. 614.

{¶43} Ordinarily, the credibility of a witness may be attacked by any party "except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Evid.R. 607(A). Under Evid.R. 614(A), the court may, "on its own or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." In the event that the court calls a witness, however, the state may impeach the witness without demonstrating surprise. *State v. Stadmire*, 8th Dist. Cuyahoga No. 81188, 2003-Ohio-873, citing *State v. Dacons*, 5 Ohio App.3d 112, 449 N.E.2d 507 (10th Dist.1982), syllabus.

{¶44} This court has held that when a witness claims a complete lack of memory regarding the events described in a prior statement, the prior statement is considered inconsistent and is therefore admissible. *State v. Wilbon*, 8th Dist. Cuyahoga No. 82934, 2004-Ohio-1784, ¶ 26, citing *State v. Portis*, 10th Dist. Franklin No. 01AP-1458,

2002-Ohio-4501. In order to introduce a witness's prior inconsistent statement, a proper foundation must be laid. *Id.* at ¶ 26, citing *State v. Soke*, 105 Ohio App.3d 226, 663 N.E.2d 986 (8th Dist.1995). A proper foundation for the admission of extrinsic evidence of a prior inconsistent statement is made upon a witness stating that she did not recall making the prior statement. *See Portis*.

{¶45} In this case, Hollowell made a statement to the police following the shooting in which he identified Conner as the individual who shot Woodard. Prior to Hollowell testifying, the court held a competency hearing in order to determine whether he was competent to testify as a witness. During his competency hearing, Hollowell claimed that he no longer remembered the events of the night in question or making a statement to the police.

{¶46} The state then requested that the court call Hollowell as a court's witness under Evid.R. 614(A). After hearing arguments on the matter, the court agreed to call Hollowell as a court's witness and allowed both parties to cross-examine Hollowell as to his prior statements identifying Conner as the shooter. Upon cross-examination, Hollowell testified that he did not remember what happened on August 20, nor did he remember giving a statement to Detective Diaz. Thereafter, the state played Hollowell's videotaped interviews with Detective Diaz. When questioned about the statement, Hollowell again replied that he has no memory of the night Woodard was killed. In instructing the jury, the court advised the jury that Hollowell's videotaped interview is not to be considered as substantive evidence, but rather, it is for impeachment purposes only.

{¶47} In light of the foregoing, we find that the trial court properly called Hollowell as a court's witness and the state laid the proper foundation to impeach Hollowell's testimony based upon Hollowell's claim of a complete lack of memory regarding the events of the night of August 20. The videotaped statement was inconsistent and therefore admissible under the circumstances. *Wilbon*, 8th Dist. Cuyahoga No. 82934, 2004-Ohio-1784, at ¶ 26. As such, the trial court did not err in allowing the state to play Hollowell's prior videotaped statement to the jury for purposes of impeaching Hollowell's credibility.

{¶48} Conner's second assignment of error is overruled.

### Sufficiency of the Evidence

{¶49} In his third assignment of error, Conner contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal because there was insufficient evidence that he committed aggravated murder, murder, and felonious assault of Damon Woodard.

{¶50} A Crim.R. 29(A) motion challenges the sufficiency of the evidence. When reviewing a challenge of the sufficiency of the evidence, an appellate court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt." *Id*. A sufficiency challenge requires us to review the record to determine whether the state presented evidence on each of the elements of the offense. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

### Aggravated Murder

{¶51} Conner contends that there was insufficient evidence of prior calculation and design in order to support his conviction for aggravated murder.

{¶52} R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." A person acts purposely when it is his specific intent to cause a certain result. R.C. 2901.22(A).

{¶53} "Prior calculation and design" indicates "'studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.'" *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 20, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). The scheme must be "'designed to implement the calculated decision to kill.'" *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993), quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). Prior calculation and design can be found even when a plan to kill is quickly conceived and executed within minutes. *State v. Coley*, 93 Ohio St.3d 253, 264,

754 N.E.2d 1129 (2001). A momentary impulse, however, is insufficient. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996.

{¶54} The existence of prior calculation and design is determined on a case-by-case analysis of the facts and the evidence. *Hill* at ¶ 21, citing *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001). The facts of a particular case can demonstrate that the defendant had adopted a plan to kill. *Conway* at ¶ 46.

{¶55} In determining whether a defendant acted with prior calculation and design, the Ohio Supreme Court has delineated three factors a court should consider:

> (1) Did the accused and victim know each other, and if so, was that relationship strained?
>
> (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and
>
> (3) Was the act drawn out or "an almost spontaneous" eruption of events?

*State v. Bolan*, 8th Dist. Cuyahoga No. 95807, 2011-Ohio-4501, ¶ 14, quoting *Taylor* at 19; *State v. Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825 (8th Dist.1976). These factors "must be weighed together and viewed under the totality of all circumstances of the homicide." *Jenkins* at 102.

{¶56} Here, the evidence presented at trial sufficiently supports the jury's determination of prior calculation and design. The evidence demonstrates that there was a strained relationship between Conner's group of close friends (Stephens, Milner, Crawford, and Elmore) and Marquis Hollowell's group (identified as the Benham boys and includes the victim, Damon Woodard). Elmore testified that Hollowell has a

"pending case" with Elmore's girlfriend. The record shows that fighting ensued between the two separate groups, following a heated exchange of words between them, for which Conner was present. Elmore testified that one of the Benham boys in a yellow shirt and dreads threw a punch at him. The evidence shows that Woodard, a friend of Hollowell, was wearing a yellow shirt. Both Crawford and Elmore were injured during the fighting.

{¶57} The evidence also shows that Conner gave thought in choosing a murder weapon. Divard Jones, the manager of the Sirrah House, testified that every person who enters the club is subject to a pat-down for weapons prior to entering the club. It is reasonable to believe that Conner did not have a weapon on his person while he was inside the club. At some point after the altercation inside the club and after he and his group of friends were ushered outside, Conner made the deliberate decision to retrieve a gun in order to shoot Woodard.

{¶58} Finally, the evidence shows that Conner's actions went beyond a momentary impulse, showing that he had formulated a plan to kill. Officer Przybylski, upon his arrival on the scene, observed Conner standing next to a young, black male in a white t-shirt lying on the ground holding his head. He then saw Conner point the gun in the direction of his zone car and shoot two to three times in the direction of his car. While exiting his vehicle, Officer Przybylski observed Conner "pivot" and move from facing him to moving to Conner's right and shooting another three to four shots. This evidence

is sufficient to show that Conner made a deliberate decision to fire two rounds of shots and he strategically positioned himself to carry out his plan.

{¶59} Although rather quickly conceived and executed in a short period of time, a rational trier of fact could have concluded beyond a reasonable doubt that Conner had formulated a plan to kill Woodard in retaliation for injuring a close friend. There is sufficient evidence to show that, after observing the altercation between his close friends and the Benham boys inside the Sirrah House and in the parking lot, and after observing Crawford's injuries, Conner retrieved a gun and, with prior calculation and design, decided to shoot Woodard.

Felony Murder and Felonious Assault

{¶60} Conner contends that there was insufficient evidence to support his conviction for murder because there was insufficient evidence that he committed the predicate offense of felonious assault. He further contends that there was no evidence that Conner knowingly caused or attempted to cause physical harm to Damon Woodard with a deadly weapon. In support of his argument, Conner claims that there was a large, aggressive crowd and a chaotic scene, during which no one actually witnessed him shoot at anyone or anything in particular.

{¶61} Under R.C. 2903.02(B), felony murder, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." In this case, the

underlying felony giving rise to the felony murder is the felonious assault against Damon Woodard.

**{¶62}** Under R.C. 2903.11(A)(1), felonious assault, "[n]o person shall knowingly * * * [c]ause serious physical harm to another." R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." An individual "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶63}** It is common knowledge that a firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce serious injury or death. *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 25, citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982). Moreover, "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989).

**{¶64}** Here, the state offered overwhelming evidence that Conner fired the shots that struck and killed Damon Woodard. Officer Przybylski testified that he observed a male with a long-sleeved, red shirt pull a gun out of the waistband of his pants, point the gun in the direction of his zone car, and fire two to three shots in his direction. He then

witnessed the shooter pivot, slightly changing his direction, and shoot another three to four shots. Officer Przybylski positively identified Conner as the individual who fired shots and the same person who was carrying the handgun while running away from him. He also identified the state's exhibit Nos. 61 and 62, a red plaid shirt and a pair of blue jeans, with one hundred percent certainty, as the clothing the shooter was wearing that same evening.

{¶65} Officers Dickens and Saffo also identified Conner as the shooter. They identified state's exhibit No. 61 as the shirt the shooter was wearing on the evening in question. Officers Dickens, Saffo, and Przybylski testified that they only lost sight of the shooter for a brief moment, when the shooter ducked down briefly by a parked car and popped back up and continued to run. Officers Dickens and Saffo recovered a .45 caliber Kimber semiautomatic firearm, state's exhibit No. 60, from the location where the shooter had momentarily ducked down. All three officers identified state's exhibit No. 60 as the gun they saw Conner firing.

{¶66} Finally, ballistics evidence showed that the .45 caliber Kimber firearm that was discovered at the crime scene was operable and the six spent cartridge casings collected from the scene were fired from the .45 caliber Kimber firearm. Detective Kooser testified that the morgue bullet that was removed from Woodard's body was fired by the same .45 caliber Kimber pistol.

{¶67} In light of the above, after viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential

elements of aggravated murder, murder, and felonious assault proven beyond a reasonable doubt.

**{¶68}** Conner's third assignment of error is overruled.

## Manifest Weight of the Evidence

**{¶69}** In this fourth assignment of error, Conner contends that the convictions for aggravated murder, murder, and felonious assault, along with the conviction for discharge of a firearm and having a weapon while under disability, are against the manifest weight of the evidence.

**{¶70}** Unlike sufficiency of the evidence, manifest weight of the evidence raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 511, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

**{¶71}** In evaluating a manifest weight claim, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not

substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶72} In support of his argument that his convictions for aggravated murder, murder, and felonious assault are against the manifest weight of the evidence, Conner "incorporates the elements of the offenses" set forth in his sufficiency challenge. He further provides that the jury must have improperly considered the testimony of Hollowell and that the testimony of the witnesses who did identify Conner as the shooter were biased and not credible.

{¶73} As we discussed under Conner's third assignment of error, the state provided substantial evidence to sustain Conner's convictions, and we incorporate our prior analysis herein. With respect to the testimony of Marquis Hollowell, we note that the trial court instructed the jury not to consider the videotaped interview of Hollowell as substantive evidence, but rather for impeachment purposes only. We have no basis to find that the jury did not follow the court's instructions, especially in light of all of the evidence outlined previously in our opinion.

{¶74} Conner also argues that the testimony of the police officers who identified him as the shooter are not credible. Specifically, he notes that Officer Przybylski was not a disinterested party and he had a personal interest in the case because he had fired his weapon and was the subject of a deadly force investigation.

**{¶75}** The credibility of the witnesses and the weight of the evidence, however, is primarily for the trier of fact, and a reviewing court must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt. *State v. Chavez*, 8th Dist. Cuyahoga No. 99436, 2013-Ohio-4700, ¶ 24, citing *DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraphs one and two of the syllabus. Because the factfinder has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of the reviewing court to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

**{¶76}** Here, in addition to the testimony of Officer Przybylski, Officers Dickens and Saffo also identified Conner as the shooter and the weapon recovered at the scene as the gun Conner was firing. Detective Kooser testified that the morgue bullet that was removed from Woodard's body, as well as the six spent cartridge casings collected from the scene, were fired by the same .45 caliber Kimber pistol the officers saw Conner firing and the weapon they recovered from the scene.

**{¶77}** The trier of fact heard the above testimony and was free to believe all, some, or none of the testimony of each witness appearing before it. After examining the entire record, weighing all the evidence and all reasonable inferences, we are not able to

conclude that the jury clearly lost its way in finding Conner guilty of aggravated murder, murder, and felonious assault.

**{¶78}** For these same reasons, we find that the convictions for discharging a firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3), and having weapons while under disability, in violation of R.C. 2923.13(A)(2), are not against the manifest weight of the evidence.

**{¶79}** Under R.C. 2923.162(A)(3), the state was required to prove that Conner discharged a firearm upon or over a public road or highway and the violation caused physical harm to Damon Woodard. Based on the evidence outlined in this opinion, there was sufficient evidence that Conner fired the gun at Woodard. Moreover, Officer Przybylski testified that he observed Conner on the "edge of the driveway apron" where he shot in the direction of his zone car, which was parked on the street near the intersection of Lee Road and Judson Drive. A .45 caliber spent shell casing, identified as having been fired from the handgun Conner was seen firing, was discovered on the south sidewalk of the parking lot near the driveway on Judson Drive. Based on these facts, it was not against the weight of the evidence to find that the shots fired by Conner were discharged over a public road.

**{¶80}** Under R.C. 2923.13(A)(2), the state was required to prove that Conner did "knowingly acquire, have, carry, or use any firearm or dangerous ordnance," and that he was under indictment for or convicted of "any felony offense of violence." The state submitted exhibit No.1, a certified journal entry for Conner's prior conviction in

Cuyahoga C.P. No. CR-514492, having been indicted for drug trafficking in violation of R.C. 2925.03, for the basis for Conner's charge of having weapons while under disability. Conner stipulated to the authenticity and admissibility of the exhibit. Because there was evidence to support a finding that Conner used a firearm, as discussed above, and the parties stipulated as to the disability element, we find that the conviction for this charge was supported by the weight of the evidence.

{¶81} In light of the foregoing, we find that this is not one of the exceptional cases in which the evidence weighs heavily against Conner's convictions for the discharge of a firearm on or near a prohibited premises or having weapons while under disability. After reviewing the entire record, weighing all of the evidence and all reasonable inferences, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice.

{¶82} Conner's fourth assignment of error is overruled.

## Motions for Mistrial

{¶83} In his first assignment of error, Conner contends that the trial court erred by denying his motions for mistrial. On four occasions, Conner moved for mistrial: (1) When Officer Przybylski testified that an upset woman spontaneously exclaimed, "What did you do now?"; (2) Upon the circumstances surrounding the admission of Marquis Hollowell's videotaped interview with the police; (3) Upon the playing of Conner's videotaped interview with crime scene detectives during which Conner mentions a prior arrest; and (4) Upon the state's use of "consciousness of guilt" in closing arguments.

**{¶84}** The decision whether to grant or deny a motion for mistrial lies within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 36, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). A mistrial should not be ordered in a criminal case "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Rather, the granting of a mistrial is necessary only when "a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

Officer Przybylski's Testimony

**{¶85}** Conner first moved for a mistrial during Officer Przybylski's testimony where the officer testified about a female approaching his zone car after he had secured Conner in the back seat. Initially, the trial court sustained defense counsel's objection, requiring the state to develop the officer's testimony. Officer Przybylski stated that the female, who claimed to be Conner's sister, was upset upon seeing Conner being placed under arrest:

> Q:   And did you have the opportunity to speak with her?
> A:   Yes.
> Q:   What was her mood or demeanor while you spoke with her?
> A:   She was upset that her brother was under arrest. Or who she claimed to be her brother. I don't know who she was.
> Q:   * * * What led you to believe she was upset?
> A:   The tone in her voice, her mannerisms.
> Q:   Was she excited?
> A:   Yeah.

**{¶86}** Following defense counsel's second objection, which was overruled, Officer Przybylski testified that when he told the woman that Conner was being arrested, she said to Conner, "What did you do now?" Following the officer's testimony, the defense moved for a mistrial, which the trial court denied.

**{¶87}** Conner argues that the trial court erred by allowing the introduction of the female's comment to Conner because it was hearsay. The state, on the other hand, claims that the "sister's" statement falls into the "excited utterance" exception to hearsay and was therefore admissible.

**{¶88}** Under Ohio Evid.R. 803(2), otherwise inadmissible hearsay is admissible if it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Excited utterances are considered trustworthy because they are made while the event is still fresh in the declarant's mind. *State v. Fields*, 8th Dist. Cuyahoga No. 88916, 2007-Ohio-5060, ¶ 51, citing *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993). The statement must concern "some occurrence startling enough to produce a nervous excitement in the declarant, which * * * the declarant had an opportunity to observe, and must be made before there had been time for such nervous excitement to lose domination over his reflective faculties." *State v. McCree*, 8th Dist. Cuyahoga No. 87951, 2007-Ohio-268, ¶ 60.

**{¶89}** We find that the above statement qualifies as an excited utterance and the state laid the proper foundation for the same. The "sister's" statement was made shortly

after the incident and immediately upon the officer's placing Conner in his zone car, at which time the officer informed her that Conner was being placed under arrest. Her comment was made before there was sufficient time to reflect on the events. The trial court, therefore, did not err in admitting the woman's comment. The motion for mistrial was properly denied.

### Marquis Hollowell's Videotaped Interview

{¶90} Conner argues that the admission of Marquis Hollowell's videotaped interview with Detective Diaz was error and the admission deprived Conner of his right to a fair trial. We have previously determined that the trial court properly admitted Hollowell's videotaped interview for the impeachment of a court's witness. We therefore find no merit to Conner's argument.

### Conner's Videotaped Interview

{¶91} Conner moved for a mistrial when the trial court admitted Conner's videotaped interview with the crime scene detectives. Defense counsel specifically objected to the last portion of the videotape wherein Conner refers to the last time that he was arrested.

{¶92} This court has held that where a witness made an isolated reference to a defendant's criminal history and there was no showing that the defendant suffered material prejudice, a mistrial is not warranted. *See McCree*, 8th Dist. Cuyahoga No. 87951, 2007-Ohio-268. Where the reference to a defendant's prior arrests is "fleeting"

and is followed by a curative instruction, "the trial court did not abuse its discretion in failing to order a mistrial." *State v. Garner*, 74 Ohio St.3d at 59, 656 N.E.2d 623.

{¶93} In this case, we do not find Conner's brief and isolated statement unfairly prejudicial so as to warrant a mistrial. Following defense counsel's objection, the court held a sidebar wherein the judge twice indicated that she did not understand what Conner had said. The prosecutor advised the court that the videotaped interview was a redacted version and that defense counsel had agreed to the redaction. Indicating that the omission was likely an oversight on the part of defense counsel, there was no prosecutorial misconduct, and the parties did agree to the redacted version, the court declined to order a mistrial and, rather, offered to give the jury a curative instruction. Not wishing to highlight the single comment, defense counsel declined the curative instruction.

{¶94} Under these circumstances, and in light of the overwhelming evidence presented in support of Conner's convictions, we cannot find that the arguably inaudible isolated comment referencing a prior arrest, without more, materially prejudiced Conner or interfered with his right to a fair trial. We find, therefore, that the trial court did not abuse its discretion in failing to order a mistrial following this remark. *See Garner* at 59.

### Consciousness of Guilt

{¶95} Finally, Conner argues that the state's reference to Conner's "consciousness of guilt" deprived him of a fair trial such that a mistrial should have been granted.

**{¶96}** Generally, Ohio courts allow prosecutors considerable latitude in closing arguments, commenting freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). A prosecutor's comments should not be taken out of context; rather, courts must review the statement within the context of the entire trial. *State v. Williams*, 8th Dist. Cuyahoga No. 90739, 2012-Ohio-1741, ¶ 12.

**{¶97}** The trial court's control over the latitude afforded counsel during closing argument is discretionary and will not be overturned on appeal absent an abuse of discretion. *State v. Grice*, 8th Dist. Cuyahoga No. 97046, 2012-Ohio-1938, ¶ 32, citing *State v. Walters*, 9th Dist. No. 2775-M, 1998 Ohio App. LEXIS 4615 (Sept. 30, 1998).

**{¶98}** Here, viewing the comment in the context of the entire closing argument and the overwhelming evidence presented at trial, we cannot find that the prosecutor's reference to Conner's "consciousness of guilt" materially prejudiced Conner such that he was denied a fair trial. The prosecutor's comment preceded a recitation of the evidence presented at trial concerning Conner's actions after he fired the gun. The prosecutor is free to comment on what the evidence has shown and what reasonable inferences may be drawn therefrom. *Lott* at 165. As such, we cannot find that the trial court erred in not granting a mistrial following the prosecutor's comments regarding Conner's consciousness of guilt.

{¶99} Conner argues, alternatively, that the admission of the four statements referenced in this assignment of error amount to cumulative error and, therefore, Conner's convictions should be reversed. However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. *Garner*, 74 Ohio St.3d at 64, 656 N.E.2d 623; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48. Because we have found Conner's arguments with regard to his four motions for mistrial to be without merit, the cumulative error doctrine does not apply in this case. *See State v. Van Williams*, 8th Dist. Cuyahoga No. 94965, 2013-Ohio-4471.

{¶100} Conner's first assignment of error is overruled.

## Closing Arguments

{¶101} In his fifth assignment of error, Conner argues that his convictions should be overturned because he was denied the effective assistance of counsel. Conner contends that his trial counsel's failure to object to the prosecutor's remark in closing arguments during which he referred to Conner's witnesses as "lying felons" was plain error and counsel's failure to object denied him the effective assistance of counsel.[2]

---

[2] It is undisputed that Conner's trial counsel failed to object to the prosecutor's alleged improper comments during the state's closing argument. Ordinarily, when the defense attorney fails to object to alleged prosecutorial misconduct, he waives all but plain error. *Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, at ¶ 78. Plain error exists only if the outcome of the trial clearly would have been otherwise but for the error. *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 61. Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978).

{¶102} In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) his counsel was deficient in some aspect of his representation, and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶103} The first element requires a showing that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. It necessarily requires that when a defendant complains of the ineffectiveness of counsel's assistance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687-688.

{¶104} Regarding the second element, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, citing *Strickland* at 694. Moreover, a defendant's failure to satisfy one element of the *Strickland* test negates the court's need to consider the other. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland* at 697.

---

The plain error standard differs, however, from the ineffective assistance of counsel standard. *State v. Seeley*, 7th Dist. Columbiana No. 2001 CO 27, 2002-Ohio-1545, ¶ 38; *State v. Murphy*, 91 Ohio St.3d 516, 559, 747 N.E.2d 765 (2001) (Cook, J., concurring). A defendant's claim that his counsel was ineffective for failing to object eliminates the requirement that an objection be made in order to preserve an error for appeal. *State v. Carpenter*, 116 Ohio App.3d 615, 621, 688 N.E.2d 1090 (2d Dist.1996). Because Conner claims that his trial counsel was ineffective for failing to objection, we will not apply the plain error standard.

{¶105} As we have previously said, courts allow prosecutors considerable latitude in closing arguments. *Lott*, 51 Ohio St.3d at 165, 555 N.E.2d 293. Nevertheless, they must "avoid insinuations and assertions calculated to mislead" and they may not express their personal beliefs or opinions regarding the guilt of the accused or allude to matters not supported by the evidence. *Id.* at 166. Prosecutors may, however, fairly comment on the credibility of witnesses based on the witnesses' testimony at trial. *Williams*, 8th Dist. Cuyahoga No. 90739, 2012-Ohio-1741, at ¶ 12. In that regard, courts must review the prosecutor's statement within the context of the entire trial, rather than take the comments out of context and give them their most damaging meaning. *Id.*, citing *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996).

{¶106} In reviewing a claim of prosecutorial misconduct, we must determine whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883 (1984). An appellate court should only reverse a conviction if the effect of the misconduct "'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 99, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶107}** In this case, during closing arguments, the prosecutor made two comments that impugn the credibility of certain witnesses. Referring specifically to Deandre Stephens, a friend of the defendant, the prosecutor stated, "God knows Deandre Stephens is not the person I would choose to testify in my case * * *. If it was up to me and I can choose my witnesses, I wouldn't bring in lying felons * * *." Thereafter, the prosecutor referred to witnesses Brandon Crawford, Sharda Elmore, Jeremy Milner, and Stephens as Conner's "lying friends."

**{¶108}** While we find the prosecutor's statements to be somewhat troubling, and seemingly evident of his opinion that Conner's friends lied, we cannot say that these isolated comments deprived Conner of a fair trial. We consider these remarks in the context of the entire closing argument. In that regard, the prosecutor told the jury, alongside the alleged improper comments, that he disagrees with the defense's assessment of the credibility of the witnesses. He then reminded the jury of its role in deciding credibility and he specifically asked the jury to consider the evidence in deciding witness credibility:

> I'm not going to ask you to go back and find [Conner] guilty. I'm going to ask you to go in the back and talk about the witnesses who testified and talk about the evidence that was presented and reach a fair decision so that the state has been treated fairly and that the defendant has been treated fairly and that your verdict reflects the evidence and how it applies to these charges.

Finally, the prosecutor asked the jury to think about what it heard in the courtroom along with the context of the testimony and the conduct of the witnesses. When considered in

this context, we do not believe the prosecutor's two comments would unduly influence the jury.

{¶109} Additionally, the court specifically instructed the jury as follows: (1) the jury was the sole judge of the facts and the credibility of the witnesses and the weight to be given to the testimony of each witness; and (2) opening and closing statements do not constitute evidence.   We have no basis to conclude that the jury did not follow the court's instructions.

{¶110} Having found that the prosecutor's remarks would not have changed the outcome of the trial, we cannot say that Conner was prejudiced by his defense counsel's failure to object.   Conner's ineffective assistance of counsel claim therefore fails, and his fifth assignment of error is overruled.

## Sentence

{¶111} In his final assignment of error, Conner argues that the trial court erred by imposing consecutive sentences and by failing to merge allied offenses of similar import.

### Consecutive Sentences

{¶112} The trial court imposed a sentence of life, with parole eligibility after 30 years, on Count 1, three years on the firearm specification, and six and one-half years on a probation violation on a different case, all of which the court ordered to be served consecutively.  Conner claims that the trial court failed to engage in a "proportionality analysis" before imposing consecutive sentences and, therefore, the sentence is contrary to law.

**{¶113}** We review consecutive sentences using the standard set forth in R.C. 2953.08. *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 8-10. That statute provides two grounds for an appellate court to overturn the imposition of consecutive sentences: (1) the sentence is "otherwise contrary to law"; or (2) the appellate court, upon its review, clearly and convincingly finds that the record does not support the sentencing court's findings under R.C. 2929.14(C)(4). *Id*. at ¶ 11; R.C. 2953.08(G)(2).

**{¶114}** R.C. 2929.14(C)(4) requires a trial court to make three distinct findings when imposing consecutive sentences. The trial court must first find the sentence is "necessary to protect the public from future crime or to punish the offender." Next, the trial court must find that consecutive sentences are "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Finally, the trial court must find the existence of one of the three statutory factors set forth in R.C. 2929.14(C)(4)(a)-(c). The failure to make these findings is contrary to law. *Id*. at ¶ 12.

**{¶115}** In this case, a review of the record demonstrates that the trial court made the statutorily mandated findings as outlined above. Upon imposing consecutive sentences, the court stated that "there is no more appropriate case for consecutive sentences." The court found that consecutive sentences are necessary to protect the public and to punish the offender and it stated that "[i]t's necessary that you spend just shy of 40 years, at a minimum, * * * in prison." The court then stated as follows:

I find, specifically, that you committed this crime while you were under a community controlled sanction. I further find that the harm is so great, and just to look at [the victim's family], you know how great the harm is. There is no greater harm.

And I find that a single term does not adequately reflect the seriousness of your conduct. I also find that your criminal history shows that consecutive terms are needed to protect the public.

Specifically in addressing the proportionality element, the trial court stated, "I also find that it is not disproportionate, this sentence, to the harm that you have caused not just to Mr. Woodard's family, but to the community as a whole."

{¶116} Moreover, the record demonstrates that the court considered the facts of the case, heard statements from the attorneys and the victim's family, addressed the seriousness of Conner's actions, and reviewed Conner's extensive criminal history.

{¶117} To the extent that Conner is arguing that the trial court did not consider proportionality and consistency as required by R.C. 2929.11(B) in imposing consecutive sentences, we find no merit.

{¶118} R.C. 2929.11(A) provides that a felony sentence shall be reasonably calculated to achieve two "overriding purposes" of felony sentencing: (1) "to protect the public from future crime by the offender and others," and (2) "to punish the offender using the minimum sanctions that the court determines accomplish those purposes * * *." In order to achieve these purposes, the sentence imposed for a felony must be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes

committed by similar offenders."  R.C. 2929.11(B).  A court that imposes a sentence for a felony has the discretion to determine the most effective way to comply with the purposes and principles of sentencing outlined in the statute.  R.C. 2929.12(A).  In exercising that discretion, however, the trial court must consider the seriousness, recidivism, and other mitigating factors set forth in R.C. 2929.12.  *Id.*

{¶119} While we note that the trial court must consider the principles and purposes of sentencing as well as the mitigating factors as outlined above, the court is not required to use particular language or make specific findings of its consideration of those factors. *State v. Jones*, 8th Dist. Cuyahoga No. 99759, 2014-Ohio-29, ¶ 13, citing *State v. Carman*, 8th Dist. Cuyahoga No. 99463, 2013-Ohio-4910, ¶ 14.  In fact, R.C. 2929.11 and 2929.12 are not fact-finding statutes, and consideration of the appropriate factors can be presumed unless the defendant affirmatively shows to the contrary.  *Id.*, citing *State v. Stevens*, 1st Dist. Hamilton No. C-130278, 2013-Ohio-5218, ¶ 12.  Nevertheless, as previously noted, the record reflects that the court considered Conner's extensive criminal record and addressed the seriousness of Conner's actions.  We are therefore not persuaded by Conner's argument in this regard.

{¶120} In light of the foregoing findings and the record before us, we cannot clearly and convincingly find that the trial court's imposition of consecutive sentences is contrary to law.

Allied Offenses of Similar Import

{¶121} At sentencing, the trial court merged Counts 1 and 2 (aggravated murder and murder, respectively), as well as Counts 3 and 4 (two counts of felonious assault of Damon Woodard). The court, however, declined to merge Count 8 (discharge of a firearm) and Count 9 (having weapons while under disability), finding they are neither allied to each other or to any other offense. Conner argues that all of the counts were committed by the same conduct and with the same animus and should therefore be merged.

{¶122} Our review of an allied offenses question is de novo. *State v. Webb*, 8th Dist. Cuyahoga No. 98628, 2013-Ohio-699, ¶ 4, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶123} The merger statute, R.C. 2941.25, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶124} Ohio courts have long used a two-prong test to determine whether multiple offenses should be considered allied offenses and merged. In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Supreme Court of Ohio instructed that, in applying the two-prong test, the particular defendant's conduct must be considered. In

the most recent allied offenses case from the Supreme Court of Ohio, *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, the court reiterated the two-prong test as follows:

> * * * The first prong looks to the import of the offenses and requires a comparison of their elements. If the elements "correspond to such a degree that the commission of one offense will result in the commission of the other," the offenses share a similar import. Only then can the merger analysis proceed to the second prong. The second prong looks to the defendant's conduct and requires a determination whether the offenses were committed separately or with a separate animus. If the offenses were committed by the same conduct and with a single animus, the offenses merge.

(Citations omitted.) *Id*. at ¶ 13.

{¶125} According to *Johnson*, if it is found that the offenses can be committed by the same conduct, the court must then determine whether the offenses were committed by the same conduct, i.e. "a single act, committed with a single state of mind." *Johnson* at ¶ 49. Stated differently, multiple offenses are "allied" "if the defendant's conduct is such that a single act could lead to the commission of separately defined offenses, but those separate offenses were committed with a state of mind to commit only one act." *State v. Thompson*, 8th Dist. Cuyahoga No. 99628, 2014-Ohio-202, ¶ 18.

**{¶126}** This court has previously considered whether the offense of having a weapon while under disability should merge with the offenses of felonious assault and discharge of a firearm near a prohibited premises. *State v. Cowan*, 8th Dist. Cuyahoga No. 97877, 2012-Ohio-5723. In *Cowan*, we determined that the animus for possessing a weapon while under disability is different from the animus for felonious assault and the discharge of a firearm over a prohibited premises, finding that "the animus of having a weapon under disability is making a conscious choice to possess a weapon." *Id*. at ¶ 39. Where the defendant "necessarily acquired a weapon sometime prior to committing the other crimes[, t]he fact that he then used the weapons to commit the other crimes does not absolve [the defendant] of the criminal liability that arises solely from his decision to illegally possess the weapons." *Id*. Therefore, because these offenses each involved a separate animus and could not result in the commission of each other under these factual circumstances, the offenses did not merge. *Id*. at ¶ 38.

**{¶127}** Likewise, in this case, Conner, who is under a disability as defined by statute, made a conscious decision to possess a gun prior to the act of firing the weapon on the evening of August 20 at the Sirrah House. Conner's subsequent conduct in firing the weapon constituted a separate and distinct act apart from his decision to possess the weapon. The trial court, therefore, properly declined to merge Conner's conviction of having a weapon while under disability.

**{¶128}** Conner further argues that Count 8, the discharge of a firearm on or near prohibited premises, should also merge. This court has previously held that, under the

first prong of the *Johnson* inquiry, it is possible to commit felonious assault by means of a deadly weapon and discharge of a firearm on or near prohibited premises by the same conduct. *Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, at ¶ 113; *State v. Melton*, 8th Dist. Cuyahoga No. 97675, 2013-Ohio-257, ¶ 54.

{¶129} We therefore turn our analysis to the second prong: whether those separate offenses were committed with a state of mind to commit only one act. *Thompson*, 8th Dist. Cuyahoga No. 99628, 2014-Ohio-202, at ¶ 18. We find that they were not.

{¶130} The evidence shows that when Conner exited the Sirrah House, a large crowd of approximately one hundred people had gathered in the parking lot and nearby streets. At some point, Conner retrieved a gun. He was on the edge of the driveway apron, near the street, when he fired two to three shots in the direction of Officer Przybylski's zone car, which was parked on the street. Conner then pivoted, changing his direction, moving from facing the officer to moving to his right, and he fired another three to four shots and began to run. The victim was discovered in the parking lot. The evidence demonstrated that a total of six shots were fired by Conner, three of which struck the victim. One of Conner's spent shell casings was discovered on the south sidewalk of the parking lot near the driveway on Judson Drive, while the other casings were discovered in the parking lot.

{¶131} Under these facts, we conclude that the act of discharging a firearm on or near a prohibited premises was committed with a separate animus, or state of mind, from

the felonious assault, aggravated murder, and murder.  Conner's conduct exceeds the degree required to commit only the one offense such that a separate animus is demonstrated as to the second offense.  *See State v. Whipple*, 2012-Ohio-2938, 972 N.E.2d 1141 (1st Dist.) (finding defendant's conduct in discharging a firearm into a habitation and felonious assault involved a separate animus for each offense); *see also State v. West*, 8th Dist. Cuyahoga No. 98274, 2013-Ohio-487 (finding separate animus as to felonious assault, possession of a firearm in a liquor permit premises, and having a weapon while under a disability where the defendant possessed a gun, shot the victim in a bar, fled from the bar, and continued to fire shots from across the street).  The trial court did not therefore err in declining to merge Count 8.

**{¶132}** Conner's sixth assignment of error is overruled.

**{¶133}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

EILEEN A. GALLAGHER, P.J., and
EILEEN T. GALLAGHER, J., CONCUR