[Cite as *State v. Thompson*, 2014-Ohio-202.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 99628

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LONNIE THOMPSON

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED IN PART, REVERSED IN PART,
### AND REMANDED FOR RESENTENCING

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-553640

**BEFORE:** Stewart, P.J., Celebrezze, J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 23, 2014

**ATTORNEY FOR APPELLANT**

Robert Botnick
The Botnick Law Firm, L.L.C.
11510 Buckeye Road
Cleveland, OH    44104


**FOR APPELLANT**

Lonnie Thompson, Pro Se
Inmate No. 640-614
Trumbull Correctional Institution
P.O. Box 901
Leavittsburg, OH    44430


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:   James A. Gutierrez
          Anna M. Woods
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 8th Floor
Cleveland, OH    44113

MELODY J. STEWART, P.J.:

{¶1} Defendant-appellant Lonnie Thompson was found to be the mastermind of a counterfeit check cashing scheme in which he created corporate payroll checks and recruited people to cash those checks at area stores in exchange for a small cut of the proceeds. A jury found him guilty of multiple counts of engaging in a pattern of corrupt activity, forgery, theft, telecommunications fraud, and identity theft. He complains on appeal about the weight and sufficiency of the evidence going to the forgery counts, that the convictions for telecommunications fraud and identity theft should have merged for sentencing, and that his sentence was disproportionate to those given to similar offenders.

I

{¶2} Thompson first argues that the court erred by denying his Crim.R. 29(A) motion for a judgment of acquittal on the forgery counts. Although he concedes that the state offered evidence to show that he forged checks in 2007, he maintains that the state offered no proof to show the origination of the counterfeit checks cashed during the period charged in the indictment (from March 2008, to September 2008).

A

{¶3} A motion for judgment of acquittal should be granted only if the evidence is "insufficient to sustain a conviction" for the charged offenses. Crim.R. 29(A). The trial judge reviews a motion for judgment of acquittal by viewing the evidence in a light most favorable to the state and deciding if that evidence is such that "reasonable minds can

reach different conclusions as to whether each material element of the crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. This is the same standard applied to due process claims concerning the sufficiency of the evidence. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ("the relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt").

{¶4} The state charged Thompson with forgery under R.C. 2913.31(A)(3), which required proof that Thompson, acting with a purpose to defraud, uttered, or possessed with purpose to utter, any writing that he knew to have been forged. "Uttering" is defined in R.C. 2913.01 as "to issue, publish, transfer, use, put or send into circulation, deliver, or display."

B

{¶5} The state offered substantial evidence to show that Thompson, in conjunction with Janell Calloway, recruited people to take payroll checks that Thompson created and cash them at area locations of a national retail store. Calloway testified that her involvement with Thompson began in late 2006 or early 2007 when he provided her with two counterfeit payroll checks that she was able to cash in exchange for $500. A few days later, Calloway and another person met with Thompson and watched him fill out checks using a typewriter. Calloway was successful in cashing those checks and

subsequently agreed to recruit other people to cash Thompson's counterfeit payroll checks.

{¶6} As the enterprise grew, Calloway persuaded others to give her photocopies of their paychecks so Thompson could use those checks as templates for his counterfeit checks. In addition to real paychecks, Thompson would sometimes use business cards and duplicate them onto checks to make them look official. When Calloway found the recruits, she would give their names to Thompson and he would prepare the counterfeit checks. At the height of the operation, during the period from March 2008 to October 2008, Calloway estimated that she recruited approximately 100 people for Thompson's counterfeit check cashing scheme.

{¶7} The police first learned about the fraud when one of the recruits gave them information in the hopes of lenient treatment in an unrelated criminal case. The recuit told police that Calloway accompanied her as she cashed two counterfeit payroll checks. The police spoke with the retailer's fraud investigator and learned that the retailer had been monitoring an unusually high number of counterfeit payroll checks that it had cashed. Because those checks sometimes used the name of the person cashing the checks (and either a driver's license or social security number), the police were able to work with the retailer and track down a number of the recruits and piece together the enterprise, including Calloway's participation.

{¶8} The police spoke with Calloway and she agreed to cooperate with them and set up a sting in which she would give Thompson names provided to her by the police.

She had second thoughts, however, and told Thompson about the sting. Two days later she told the police that she wanted to back out. The police hastily obtained a search warrant for Thompson's premises. They found a computer and printer, along with a black book containing names, addresses, and social security numbers of various individuals. They also found copies of legitimate payroll checks taped to the underside of a dresser drawer.

## C

{¶9} Viewing the evidence most favorably to the state, we conclude that a rational trier of fact could find that the state offered evidence going to each element of forgery as charged under R.C. 2913.31(A)(3). Importantly, Thompson was not charged with forging the writing of another under subdivision (A)(1) of R.C. 2913.31 — he was only charged with uttering, or delivering, a writing that he knew to have been forged. So rather than having to offer evidence to show that Thompson actually forged the checks, the state only had to offer evidence to show that Thompson, in facilitating a fraud, knew the checks he gave to Calloway were forged. That being the case, the state offered ample evidence to show that during the time frame from March 2008, to September 2008, Thompson knew the checks he gave to Calloway were forged.

{¶10} The object of the criminal enterprise was to negotiate counterfeit payroll checks. Evidence showed that Thompson prepared the checks using information that he asked Calloway to obtain from her recruits. At the beginning of the enterprise, he drove Calloway and her recruits to the retail locations to cash the counterfeit checks. Even

after his relationship with Calloway strengthened to the point where she alone accompanied the recruits, he kept track of the checks and told Calloway to return all uncashed checks to him. This was done so that he could record check numbers to ensure that they were not repeated. Not wanting to repeat check numbers was evidence that Thompson knew that the checks were counterfeit.

{¶11} On one occasion, Calloway was arrested while using a phony identification when trying to cash one of the counterfeit checks. She called Thompson to tell him that she and the recruits had been stopped by the police. Thompson told her, "whatever [you] do, don't let them get that paper." She said that the recruits actually ate the checks. Thompson's directive that Calloway and her recruits not let the checks fall into the hands of the police manifested his understanding that the checks were counterfeit.

{¶12} In addition to evidence regarding the nature of the criminal enterprise, Thompson instructed Calloway on how to fabricate accounts for the checks. For example, he told her to find someone with a legitimate payroll check and photocopy the paycheck so he could use it as a template for a counterfeit check. The police were able to confirm this testimony when a search of Thompson's residence uncovered two legitimate paychecks, from different companies, that he had hidden. Thompson did not work for either company, so the jury could have considered the checks as circumstantial evidence that he was using them in furtherance of a scheme to cash counterfeit payroll checks.

{¶13} All of this evidence was specifically directed at the time frame from March 2008 to September 2008. What is more, the state offered more than just the testimony of Calloway — 15 of the recruits agreed to plead guilty in exchange for their testimony against Thompson. They collectively confirmed Calloway's testimony that they were recruited to cash counterfeit payroll checks. One of the recruits, Theresa Frescki, specifically testified that Thompson drove her to a retail store to cash a counterfeit check and that she received the check from Calloway's son, who in turn had received the check from Thompson. We therefore find that the state presented sufficient evidence to show that Thompson, in facilitating a fraud, knew the checks he gave to Calloway were forged.

II

{¶14} Thompson next argues that his convictions were against the manifest weight of the evidence, but does not independently argue that point. He does nothing more than reincorporate the facts he addressed in his first assignment of error. In addition, his entire argument states: "The manifest weight of the evidence fails to demonstrate Appellant as the ring leader behind this elaborate check cashing scheme and the witnesses' testimony relating to this involvement was either stale or completely biased."

{¶15} "A claim that a jury verdict is against the manifest weight of the evidence involves a separate and distinct test that is much broader [than the test for sufficiency]." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193. We have consistently held that the App.R. 16(A)(7) obligation to present an argument with respect to each assignment of error presented for review does not allow an appellant to

"incorporate" an argument about the weight of the evidence into an earlier argument that a conviction is not supported by sufficient evidence. *See, e.g., State v. Milligan*, 8th Dist. Cuyahoga No. 98140, 2012-Ohio-5736, ¶ 6. To allow otherwise would be to ignore the separate and distinct nature of arguments going to the sufficiency and weight of the evidence. .

{¶16} Thompson does not differentiate his sufficiency of the evidence argument from his manifest weight of the evidence argument, so we can summarily overrule this assignment of error. And to the extent there is some differentiation between the two arguments, he fails to present an argument going to the weight of the evidence. Rather, he reaches a conclusion — the witnesses' testimony was either "stale or completely biased" — without actually explaining how that conclusion is warranted. Again, this is a failure of the App.R. 16(A)(7) obligation to present an argument with respect to each assignment of error presented for review. We therefore overrule this assigned error.

III

{¶17} In his third assignment of error, Thompson argues that his convictions for telecommunications fraud and identity theft, contained in Counts 30 and 31 respectively, should have merged for sentencing. He maintains that the court specifically found those counts to be allied offenses, but did not merge them despite ordering that they be served concurrently.

{¶18} When a defendant's conduct results in the commission of two or more "allied" offenses of similar import, that conduct can be charged separately, but the

defendant can be convicted and sentenced for only one offense. R.C. 2941.25(A). Offenses are "allied" and must be merged for sentencing if the defendant's conduct is such that a single act could lead to the commission of separately defined offenses, but those separate offenses were committed with a state of mind to commit only one act. *See State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 48-50.

{¶19} Count 30, the telecommunications fraud count (R.C. 2913.05(A)), charged that Thompson, having devised a scheme to defraud, knowingly completed an online credit card application by using another person's name. Count 31, the identity theft count (R.C. 2913.49(B)(1)), charged that Thompson, without the express or implied consent of the victim, used personal identifying information of the victim to hold himself out to be the victim.

{¶20} During sentencing, the court ordered the telecommunications fraud and identity theft counts to run concurrent to each other stating, "because I find those are the same acts, just one transaction." The state argues that applying for a credit card using another person's name is separate from taking the identity of an actual person, but we see no distinction. The common thread with both charges was that Thompson held himself out to be another person — Thompson could not have committed telecommunications fraud by applying for a credit card in another person's name unless he actually used that person's name as his own. In this circumstance, Thompson's conduct was such that a single act (applying for a credit card using another person's name) could give rise to the two charged offenses, but those offenses were committed with a single state of mind to

commit only one act. The court correctly concluded that the offenses were committed by the same act, but erred by failing to merge those counts for sentencing. We sustain this assignment of error and remand for resentencing at which time the state may choose which of the two offenses it will pursue for sentencing. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 25.

IV

**{¶21}** In a pro se assignment of error, Thompson argues that the court abused its discretion by imposing a total sentence of 32 and one-half years. The length of Thompson's sentence was the result of the court ordering a number of the counts to be served consecutively.

A

**{¶22}** R.C. 2953.08(A) places strict limits on an appellate court's ability to review criminal sentences. In particular, R.C. 2953.08(G)(2) states that "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." The court has full discretion to sentence within the statutory range, *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus, so we have no authority to review a claim that the sentences ordered on individual counts was an abuse of the court's discretion. *State v. Akins*, 8th Dist. Cuyahoga No. 99478, 2013-Ohio-5023, ¶ 18. Thompson makes no argument that any of the sentences fell outside the statutory range for the applicable degree of felony, so we cannot review this aspect of his assignment of error.

B

**{¶23}** The same ban on a reviewing court applying an abuse of discretion standard applies to the court's directive that Thompson serve some of those sentences consecutively. The decision whether to order an offender to serve prison terms consecutively is within the court's discretion. R.C. 2929.14(C)(4) states: "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court *may* require the offender to serve the prison terms consecutively * * *." (Emphasis added.) To be sure, the court must make certain findings before imposing consecutive sentences, and the failure to make those findings would render consecutive sentences "contrary to law" under R.C. 2953.08(A)(4). *Akins* at ¶ 14. But those findings were properly made and Thompson makes no argument that they were not. We thus have no basis for reviewing the court's decision to impose consecutive sentences.

C

**{¶24}** Finally, Thompson argues that his sentence was disproportionate to those given to his codefendants.

**{¶25}** The concept of "proportionality" in felony sentencing arises only in the context of consecutive sentences. Under R.C. 2929.14(C)(4), one of the findings the court must make before it can impose consecutive sentences is that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Notably, this finding relates solely to the offender's conduct and not to the conduct of any others — it does not require the court to

compare the offender's conduct to that of others. As we previously noted, Thompson raised no argument that the court failed to make the required findings before imposing consecutive sentences, so he cannot claim that consecutive sentences are disproportionate to his conduct.

**{¶26}** What Thompson actually argues is that his sentence is not "consistent with sentences imposed for similar crimes committed by similar offenders" as required by R.C. 2929.11(B). We have held that "consistency" in sentencing is not the same as uniformity. *State v. Bonness*, 8th Dist. Cuyahoga No. 96557, 2012-Ohio-474, ¶ 27. When codefendants accept plea bargains for reduced charges in exchange for agreeing to testify against a codefendant, they are no longer "similar" offenders for purposes of R.C. 2929.11(B). Sentences given to codefendants under those circumstances are incomparable, so the court had no obligation to sentence Thompson similarly to his codefendants.

**{¶27}** Thompson's convictions are affirmed, however we reverse in part and remand to the trial court for resentencing consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MELODY J. STEWART, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
KATHLEEN ANN KEOUGH, J., CONCUR