[Cite as *State v. Thigpen*, 2016-Ohio-1374.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 102467

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# LORENZO THIGPEN

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-563007-A

**BEFORE:**    Stewart, J., Kilbane, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:**    March 31, 2016

**ATTORNEY FOR APPELLANT**

R. Brian Moriarty
55 Public Square, 21st Floor
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

Yosef M. Hochheiser
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH 44113

MELODY J. STEWART, J.:

{¶1} After following a speeding vehicle to a neighborhood area used as an illegal dumping ground, police officers saw defendant-appellant Lorenzo Thigpen dragging something from a vehicle. As the officers approached Thigpen, he tried to hide behind a pile of debris and then fled on foot. The police found a badly beaten body inside the vehicle. After apprehending Thigpen, the police learned that the vehicle he had been driving belonged to the victim; that he may have been involved in the theft of tools from the victim; that he was seen hours before his arrest driving at the address where the victim lived; that the victim's apartment had been burglarized earlier that day; that a glove found in the victim's apartment was stained with the victim's blood and had Thigpen's DNA inside the glove; that hours before being apprehended, Thigpen tried to obtain a shovel for digging; and that Thigpen's own vehicle bore traces of the victim's blood. On this evidence, a jury found Thigpen guilty of aggravated murder, murder, burglary, grand theft of a motor vehicle, tampering with evidence, abuse of a corpse, failure to comply with an order or signal of a police officer, and receiving stolen property. After merging certain counts for sentencing, the court sentenced Thigpen to a term of life in prison without parole.

{¶2} On appeal, Thigpen complains that the state failed to offer sufficient evidence to establish that he committed any of the charged crimes; that the court erred by allowing the state to offer other acts evidence in the form of testimony that he sought to use PCP

on the night of the murder; and that the state violated his right to confrontation by delaying his access to the police statement of a state's witness. We find no error and affirm.

{¶3} Thigpen's first assignment of error is that the state failed to offer sufficient evidence to show that he committed aggravated murder in violation of R.C. 2903.01(A) by acting with prior calculation and design to cause the victim's death as charged in Count 1 of the indictment. However, the jury found Thigpen *not guilty* of Count 1 — the jury found Thigpen guilty of Count 2 of the indictment, which charged him with felony murder under R.C. 2903.01(B). Because the first assignment of error relates solely to a count on which Thigpen was acquitted (a fact acknowledged by appellate counsel during oral argument), we summarily overrule it.

{¶4} Although the second assignment of error is styled as one challenging the sufficiency of the evidence supporting his convictions, Thigpen's argument is directed to the weight of the evidence. And while Thigpen's fourth assignment of error purports to raise a separate challenge to the weight of the evidence, it contains no independent discussion, relying instead on "the same reasons as discussed in the sufficiency assignment of error above[.]" Appellant's brief at 20.

{¶5} The Due Process Clause of the United States Constitution requires criminal convictions to be based on legally sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence is considered "legally sufficient" if, after viewing the evidence most favorably to the state, "any rational trier of

fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. This is a quantitative standard of evidence that looks only at whether any rational trier of fact could find that the evidence existed; in other words, did the state offer *any* evidence going to each essential element of the offense. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). If so, the evidence is legally sufficient for purposes of the Due Process Clause. The sufficiency of the evidence standard requires great deference to the trier of fact. A reviewing court

> faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

*Cavazos v. Smith*, 565 U.S.___, 132 S.Ct. 2, 6, 181 L.Ed.2d 311 (2011), quoting *Jackson* at 326.

{¶6} If the legal sufficiency of the evidence standard is quantitative, the weight of the evidence is qualitative. *Thompkins* at 387. This standard requires the reviewing court to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986). This is a difficult burden for an appellant to overcome because the trier of fact has the sole responsibility to resolve factual issues. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph

one of the syllabus. The deference we give to the resolution of factual issues is underscored by our recognition that the trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). While it has been said that the weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other," *Thompkins* at 387, the use of the word "greater" does not imply a simple balancing of the evidence such that the tipping of the scale in the appellant's favor will result in the reversal of a conviction. The standard of review uses the word "manifest," indicating that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence.

{¶7} The difference between the sufficiency of the evidence and the weight of the evidence standards of review are such that a criminal defendant must make independent arguments for each. The failure to do so violates App.R. 16(A)(7), which requires an argument "with respect to each assignment of error presented for review[.]" *See State v. Thompson*, 8th Dist. Cuyahoga No. 99628, 2014-Ohio-202, ¶ 16. In addition, because the inquiry into the legal sufficiency of the evidence is based on the elements of the offense, an assignment of error to that effect must refer to the specific element or elements of the charged offense that were not supported by the evidence. *State v. Evans*, 4th Dist. Pickaway No. 06CA34, 2007-Ohio-6575, ¶ 22.

**{¶8}** Thigpen's second assignment of error does not reference any of the statutory elements of the charged offenses as part of an argument that the state failed to offer any evidence to prove those elements. Thigpen argues that the state failed to present evidence proving his identity as the killer, noting that photographs of the victim and the crime scene showed large amounts of blood, even though the police found none of the victim's blood on Thigpen when they arrested him. Thigpen argues that the actual murderer must have worn gloves to move the victim's body. And because he was not wearing gloves at the time of his arrest, Thigpen maintains that he could not have been driving the vehicle in which the victim's body was found. These arguments go to the weight of the evidence, so we limit our discussion accordingly.

**{¶9}** The state's evidence showed that the victim lived in an upstairs room of a house that was used as an after-hours club. He and Thigpen knew each other, not only from frequenting the club, but because they were automobile mechanics who worked out of the same garage. The evidence showed that at some point in time prior to the murder, the victim's tools were stolen from the garage and he blamed Thigpen for the theft. Thigpen told the victim that he would give the tools back.

**{¶10}** Thigpen was among those present at the after-hours club on the evening of the murder. At about 3:30 a.m., the caretaker of the house (the owner lived out-of-state) closed up the house. Thigpen backed his car out of the driveway and onto the street so that the caretaker could pull his own car onto the street. As the caretaker drove away, he saw Thigpen walking toward the driveway of the house. The caretaker returned to the

house at around 4:00 p.m. the following afternoon and discovered that the front door of the house had been forcibly opened. Furniture on the first floor of the house and in the victim's second-floor room had been overturned and there was blood on the outside door.

{¶11} It was shortly after the caretaker had discovered the break-in that police officers on patrol happened to see a sport utility vehicle ("SUV"), later identified as belonging to the victim, being driven at a high speed. The officers lost sight of the SUV and turned into an area of vacant lots that they knew were used as a dumping ground for junk and trash. Fearing that debris on the road surface might cause a flat tire, the officers parked their cruiser and proceeded on foot to see if they could locate the SUV. They quickly discovered the SUV and saw Thigpen "pulling or dragging something" from the SUV. Thigpen noticed the officers and attempted to hide behind a pile of debris, but his head remained visible to the officers. Although the officers ordered Thigpen to show his hands, he remained behind the debris pile. At the same time, one of the officers approached the SUV and discovered the victim's body. Thigpen fled but, with one officer pursuing on foot and another police cruiser responding to join the search, he was apprehended. Without prompting from the police, Thigpen said, "I didn't do it." After being handcuffed, Thigpen started running away, but was stopped after a few steps.

{¶12} The coroner determined that the victim's death was caused by "[b]lunt impacts to head, torso, and extremities with brain, skeletal and soft tissue injuries, and neck compression." Autopsy photographs showed that the victim had been struck with enough force to cause his forehead to cave. The victim's body was covered in blood.

The police discovered blood on the stairs of the after-hours house, on the driveway near the door that had been forced open, and on the wall of the garage and on other items located nearby. Cigarette butts found on the driveway near the blood stains tested positive for Thigpen's DNA. A work glove recovered from the driveway bore a stain that was later determined to be the victim's blood. The state's expert concluded that DNA found inside the work glove was a mixture of two individuals, and that neither the victim nor Thigpen could be excluded as possible contributors of that DNA. A knit hat found inside of the SUV also contained DNA matching the profile for both the victim and Thigpen.

{¶13} In their investigation, the police located a different vehicle that Thigpen had been seen driving the morning of the murder. The person who owned the car testified that she had given the car to Thigpen for repair work at least two weeks prior to the date of the murder, but that her repeated requests for him to return the car went unanswered. She said that she kept the interior of the car clean, but identified photographs of the car taken immediately after the murder that showed that Thigpen had "trashed" it. The police discovered the victim's blood inside the vehicle. The vehicle also contained some personal possessions belonging to either the victim or the person who owned the house where the after-hours club was located. Items of a mechanical nature were also found in the car, and a mechanic at the automobile repair shop where Thigpen worked identified some of those items as having been stolen from the shop.

**{¶14}** Another witness for the state testified that he worked at an automobile shop. He said that on the day when the police discovered Thigpen and the victim's body, he saw Thigpen pull up in the victim's SUV and inquire about a coworker. The coworker was not present and Thigpen left the premises without exiting the SUV. Thigpen returned a while later, exited the SUV, and entered the shop. He and another person then began removing some items from the back of the SUV. Thigpen then drove away, but returned just moments later and asked the witness for a shovel. The witness brought out a shovel with a wide blade, but Thigpen said that he could not use that kind of shovel.

**{¶15}** It is true that the state's case was based on circumstantial evidence, but that circumstantial evidence was compelling enough that the jury did not lose its way by finding Thigpen guilty. Thigpen was seen driving the victim's SUV and asking for a shovel. Not long after that, the SUV was spotted by the police because it was moving at a high rate of speed. Although the police lost sight of the SUV as they followed it, they did so only for about five minutes before they located it in the dumping ground. Both officers identified Thigpen as the person they saw trying to drag something from the SUV. Thigpen's immediate reaction to the police was to hide, and then to flee. Although he denied killing the victim, he never offered any explanation to show why he was a mere victim of circumstance, an omission that could well allow the jurors to infer that his presence by the SUV was not innocent.

**{¶16}** Evidence that items belonging to the victim and the owner of the house where the after-hours club was operated incriminated Thigpen. The broken lock on the

front door of the house showed forcible entry. Furniture had been overturned on both floors of the house in a manner consistent with a burglary. The vehicle that Thigpen drove on the morning before the murder contained items that belonged to both the victim and the person who owned the house. The owner of the vehicle did not know the victim and said that she would not have been responsible for his property being in her vehicle.

{¶17} Thigpen argues that the state failed to explain the lack of blood on him given the amount of blood loss by the victim. The absence of the victim's blood on Thigpen went unanswered by the state, but was offset by other DNA evidence connecting the victim and Thigpen: the victim's blood was found in Thigpen's car; a black knit cap taken from Thigpen's car contained a mixture of both his and the victim's DNA; and neither Thigpen nor the victim could be excluded as the source of DNA found in a glove discovered at the scene of the beating. What is more, Thigpen's assertion that he was a victim of circumstance is contradicted by evidence showing that the vehicle he was driving contained items belonging to both the victim and the owner of the house, he asked someone for a shovel, he was discovered pulling the victim's body from the SUV, and he ran from the police upon being discovered attempting to remove the victim's body from the SUV. This evidence showed active participation in the crimes and undermined any claim by Thigpen that he was a mere victim of circumstance.

{¶18} Finally, Thigpen argues that the person who worked at the auto repair shop and claimed to have seen him driving the SUV was inherently unbelievable. He maintains that the witness was a career informant, had committed crimes involving

dishonesty (tampering with records and insurance fraud), and at the time of trial was facing trial on multiple counts of forgery, grand theft, and receiving stolen property. He also argues that the witness waited nearly two months to tell the police about seeing Thigpen driving the SUV and asking for a shovel, suggesting that the witness was acting opportunistically in order to curry favorable treatment in his own criminal case.

{¶19} The jury was well aware of the witness's past criminal record, his work as an informant for the Federal Bureau of Investigation, and the motivation he might have to come forward with testimony against Thigpen. No doubt the jury weighed his testimony accordingly. However, Thigpen's assertion that the witness lacked credibility because he waited two months to come forward is not borne out by the record. The witness testified that he immediately informed his FBI handler about what he had seen, and that it was two months later when his handler took him to meet the police for an interview. There was no indication that the witness had any direct contact with the police, so it was plausible that the FBI handler arranged the meeting with the police consistent with the witness's testimony.[1]

---

[1] The fifth assignment of error also touches on the timing on the witness's decision to come forward to the police. Thigpen cross-examined the witness on inconsistencies between his direct testimony and the statement he gave to the police regarding when he first told the police that he saw Thigpen pull into the automotive garage. The state objected, arguing that if Thigpen were allowed to cross-examine on the inconsistencies in the statement, it should be allowed to introduce the entire police statement. The court agreed, causing Thigpen to cease that line of questioning rather than allow the entire police statement into evidence. Thigpen argues on appeal that the court's decision violated his right to confront the witness, but we agree that the state could offer the witness's police statement on redirect examination. *State v. Williams*, 8th Dist. Cuyahoga No. 96752,

**{¶20}** But even if the jury disbelieved the informant's testimony that Thigpen had been seen driving the SUV shortly before the murder, other evidence led to the conclusion that he had driven the SUV to the dumping ground. Photographs of the SUV showed that the rear seats of the vehicle had been folded down to accommodate the victim's body. In addition, photographs of the front passenger seat of the SUV showed it had been hinged forward and so loaded with items that it was impossible for anyone to sit there. In short, the SUV had space for only the driver. To believe Thigpen, the jury would have had to conclude that the driver of the SUV abandoned the vehicle in the dumping lot and that Thigpen just happened to be present in the lot no more than five minutes later (accounting for the period of time in which the police said that they lost sight of the SUV). None of that explains why he was seen pulling something from the SUV, nor does it explain how the victim's blood and possessions were found in the car that he had been driving.

**{¶21}** On balance, the evidence weighed in favor of Thigpen's guilt. To the extent that Thigpen could challenge the credibility of some aspects of the state's case, much of the state's evidence went unchallenged. We cannot conclude that the jury lost its way by finding Thigpen guilty.

**{¶22}** The third assignment of error raises a claim that the court improperly allowed the state to rely on other acts evidence in violation of Evid.R. 404(B). He

---

2012-Ohio-1043, ¶ 34-38; *State v. Wilson*, 8th Dist. Cuyahoga No. 96380, 2012-Ohio-102, ¶ 41. Rather than have the entire statement read into evidence, Thigpen made the strategic decision to forego further impeachment.

complains that the court should not have allowed a state witness to testify that he asked the witness if she wanted to smoke "wet": a word commonly understood to indicate a marijuana joint laced with PCP.[2]

{¶23}   Evid.R. 404(B) states that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

{¶24}   The rule prohibits the introduction of other acts because there is the danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crimes charged in the indictment.  *State v. Cotton*, 113 Ohio App.3d 125, 131, 680 N.E.2d 657 (1st Dist.1996).   And while the rule creates an exception for the admissibility of "other acts" evidence when it is probative of a particular matter, that matter must genuinely be at issue — the acts constituting the scheme, plan, or system must be a part of the immediate background of the crime and inextricably related to it. *State v. Curry*, 43 Ohio St.2d 66, 69, 330 N.E.2d 720 (1975).

{¶25} Evidence of other acts may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

---

[2] Thigpen also maintains that the court abused its discretion by allowing the owner of the vehicle that he had been driving at the time of the murder to "suggest" that he had held onto the car for so long that he had stolen it.   He makes no independent argument on this claim — the argument for this assigned error is devoted entirely to the claim that the court abused its discretion by allowing a witness to testify that he desired to ingest PCP.   The failure to separately argue the issue of the vehicle violates App.R. 12(A)(1)(c) and 16(A)(7).   So we decline to address it.

mistake or accident. But even if admissible under Evid.R. 404(B), other acts evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. *See* Evid.R. 403(A). The admission or exclusion of other acts evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶26} A person who frequented the after-hours club testified that she was in the club on the early morning of the murder. She said that the caretaker of the club was attempting to close for the night, but Thigpen, whom she described as "kind of hyper," attempted to persuade him to keep the club open. Even though the caretaker refused to keep the club open, Thigpen "turned up with another bottle and started drinking." The witness then heard Thigpen ask another patron if "anybody want to get high off some wet." The court overruled Thigpen's objection to this statement.

{¶27} The state maintains that evidence of PCP was relevant to bolster "the identification at issue." Appellee's brief at 29. It is unclear, however, to what identification the state refers. The state notes that some cigarette butts recovered from the driveway of the house near where the murder occurred contained Thigpen's DNA; presumably, testimony that he wished to smoke a PCP-laced marijuana joint would tie him to the cigarette butts.

{¶28} The difficulty with the state's argument is that testimony that Thigpen wanted to ingest PCP did nothing to establish his presence at the murder scene. There

was no proof that he actually ingested PCP — the testifying witness admitted that she did not actually see Thigpen smoke anything. And the state fails to account for the fact that there was no evidence that any of the cigarette butts found on the driveway actually contained PCP. There was no relevance of any kind to the PCP testimony, so the court abused its discretion by denying Thigpen's objection to this testimony.

{¶29} Even though the court abused its discretion by overruling Thigpen's objection to the PCP testimony, Thigpen must nonetheless show prejudice from the court's error. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 27. We determine prejudice by considering whether the error affected the outcome of trial; or stated differently, we consider whether the verdict would stand even if we excise the offending evidence. *Id*. at ¶ 28-29. If the verdict would stand even without the offending evidence, the error is harmless.

{¶30} Thigpen's conviction for murder did not hinge on the erroneous admission of testimony that he inquired about smoking PCP. The evidence we have detailed weighed heavily against Thigpen: it placed him at the scene of the murder, it placed him in the dumping ground where he was seen trying to move the victim's body, and DNA evidence tied him to the victim in several respects. His alleged desire to smoke PCP was not the tipping point for his conviction, so the court's error in admitting the testimony was harmless.

**{¶31}** The sixth assignment of error relates to the failure to comply count and complains that the state failed to offer sufficient evidence to show that the order for Thigpen to stop pertained to the control and regulation of traffic.

**{¶32}** The state charged Thigpen with a violation of R.C. 2921.331(A). That section states: "No person shall fail to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic."

**{¶33}** Exactly what the General Assembly meant when it used the words "authority to direct, control, or regulate traffic" has been the subject of some debate in the appellate courts. In *State v. Wagenknecht*, 9th Dist. Wayne No. 2864, 1994 Ohio App. LEXIS 2962 (June 29, 1994), the court held that R.C. 2921.311(A) does not require that a police officer's order "directly relate to traffic matters." The court held that:

> The plain meaning of the statute is that a person is guilty of failure to comply, if, after receiving a lawful order from a police officer invested with authority to direct, control, or regulate traffic, that person failed to comply with that order. The police officer's authority must derive from traffic regulation.

*Id*. at *5.

**{¶34}** However, in *State v. Redd*, 2d Dist. Montgomery No. 20284, 2004-Ohio-4689, the court held that the violation of a "lawful order" contemplated by R.C. 2921.331(A) is one that:

> [I]nvolves the offender's act or omission in operating a motor vehicle which, by law, an officer is charged with authority to direct, control, or regulate. The manner of that operation need not be unlawful. It is only necessary that the officer be charged by law with authority to direct it and that the offender fails to comply with the officer's particular direction.

*Id*. at ¶ 19.

**{¶35}** We cannot fully agree with either *Wagenknecht* or *Redd*: neither decision follows the unambiguous wording of R.C. 2921.311(A) when they limit the scope of the statute to orders issued in the context of traffic regulation.

**{¶36}** Rules of statutory construction state that the intent behind a statute resides in its clear and unambiguous language, given the common and ordinary meaning of the words used. *See* R.C. 1.42; *Youngstown Club v. Porterfield*, 21 Ohio St.2d 83, 86, 255 N.E.2d 262 (1970). If a statute is clear and unambiguous, there is no need for interpretation and we apply the statute as written. *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 1996-Ohio-291, 660 N.E.2d 463.

**{¶37}** R.C. 2921.331(A) refers to a police officer "invested" with "authority" to direct, control, or regulate traffic. A "police officer" is defined by R.C. 4511.01(Z) as "every officer authorized to direct or regulate traffic, or to make arrests for violations of traffic regulations." As used in R.C. 2921.331(A) and 4511.01(Z), the words "authority" and "authorized" mean the power to do something — in this case, to direct, control, or regulate traffic. For police officers, the authority to direct, control, or regulate traffic exists by virtue of the position, regardless of whether the police officer is actually engaging in traffic direction, control, or regulation. In other words, nothing in the plain language of R.C. 2921.331(A) limits it solely to orders or signals of police officers actively engaging in traffic direction, control, or regulation. If the police officer is, at the time the order at issue is given, authorized to direct, control, or regulate traffic, and if the

order itself is "lawful," the plain language of R.C. 2921.331(A) states that a person must comply with the order. So this duty to comply exists even if the police officer's order is not made in the context of enforcing any traffic law. If the General Assembly intended a different meaning for R.C. 2921.331(A), it could have worded the statute to apply to police officers engaged in the direction, control, or regulation of traffic.

{¶38} We stress two points about the statute. First, even though "authorized" by virtue of a position as a police officer to direct, control, or regulate traffic, not all police officers can validly enforce the traffic laws. For example, only uniformed police officers can generally issue traffic citations. *See* R.C. 4549.15; *Westlake v. Krebs*, 8th Dist. Cuyahoga No. 81382, 2002-Ohio-7073. And a police officer enforcing the motor vehicle laws while using a motor vehicle must be in a vehicle "marked in some distinctive manner or color" and "equipped with * * * at least one flashing, oscillating, or rotating colored light mounted outside on top of the vehicle." R.C. 4549.13. This means, for example, that police officers in plain clothes or unmarked cars cannot issue traffic citations.

{¶39} Second, R.C. 2921.331(A) only requires compliance with a "lawful" order from a police officer. So, for example, orders that violate a person's rights against unreasonable searches and seizures under the Fourth Amendment of the United States Constitution, or the Fifth Amendment right against self-incrimination, are not lawful and cannot be the basis for a violation of R.C. 2921.331(A).

{¶40} The police officers who issued the order for Thigpen to stop and show his hands testified that they were in uniform and driving a marked police car. They first saw the SUV "traveling faster than it should have been on those roads. Those roads were really in bad shape; hardly any traveling over there, at all." But no sooner did they decide to follow the SUV then they lost sight of it. One of the officers testified that losing sight of the SUV "made us more curious where this truck had gone." The other officer agreed that after losing sight of the SUV, "[w]e decided to investigate it[.]" When the officers located the SUV, it was parked in the illegal dumping ground and Thigpen was standing outside the vehicle, appearing as though he was dragging or pulling something from it. As the officers approached the vehicle, Thigpen became alerted to their presence and tried to hide. It was at that point that the officers told Thigpen to come out from hiding and show his hands. When he saw that the officers had discovered the body in the back of SUV, Thigpen fled.

{¶41} These facts establish that the officers were authorized to direct, control, or regulate traffic. In addition, their testimony established that they had a reasonable suspicion that Thigpen was engaged in illegal dumping. Their order for him to stop and show his hands was obviously given in preparation for conducting an investigative stop. That order was lawful. Thigpen's flight from the officer established his failure to comply with the order that he stop and show his hands. The state thus offered sufficient evidence to prove the count of failure to comply.

{¶42} Judgment affirmed.

It is ordered that appellee recover of said appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MELODY J. STEWART, JUDGE

MARY EILEEN KILBANE, P.J., and
MARY J. BOYLE, J., CONCUR