[Cite as *State v. Anderson*, 2025-Ohio-5633.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO, :

       Plaintiff- Appellee, :

                                    No. 114979

       v. :

EASHAWN ANDERSON, :

       Defendant-Appellant. :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 18, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-694446-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Liam E. Blake, Assistant Prosecuting Attorney, *for appellee.*

Mary Catherine Corrigan, *for appellant.*

---

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Defendant-appellant Eashawn Anderson appeals his felonious-assault and domestic-violence convictions. He raises three assignments of error for our review:

1. The guilty verdict cannot be upheld because the evidence and testimony presented at trial did not establish the appellant's guilt beyond a reasonable doubt as to either count.

2. Trial court erred by failing to grant the appellant's request for a mistrial following [the victim] telling the jury of the appellant's prior incarcerations.

3. The trial court erred by introducing medical records of continuing medical treatment absent the required notice pursuant to Evid.R. 902.

{¶ 2} After review, we conclude that the State met its burden of disproving that Anderson acted in self-defense beyond a reasonable doubt, and proved beyond a reasonable doubt that Anderson committed felonious assault and domestic violence against the victim. We further conclude that the trial court did not err when it denied Anderson's request for a mistrial because the victim's reference at trial that she had to get Anderson out of jail was fleeting and the trial court immediately gave the jury a curative instruction. And finally, we find no error on the part of the trial court in admitting the victim's medical records over Anderson's objection because the State sent the records to Anderson five months before trial, which provided Anderson considerable time to inspect the records and ample opportunity to challenge them. Moreover, even if we agreed with Anderson that the trial court erred in admitting the records because of insufficient notice, any purported error did not affect Anderson's substantial rights at trial. We therefore overrule Anderson's assigned errors and affirm his convictions.

## I. Procedural History and Facts

{¶ 3} In August 2024, Anderson was indicted on three counts: Count 1, felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony; Count 2,

domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony because of a previous domestic violence conviction; and Count 3, strangulation in violation of R.C. 2903.18(B)(3), a fourth-degree felony. Anderson pleaded not guilty to the charges at his arraignment.

{¶ 4} Prior to trial, Anderson filed a Crim.R. 12.2 notice that he would be offering evidence of self-defense at trial. Anderson stated that pursuant to the rule, he intended to offer evidence of three prior incidents where the victim either punched him in the face or bit him on the hand.

{¶ 5} Anderson filed several motions in limine before trial. He asked the court to prevent the victim or the State from discussing the fact that he filed his Crim.R. 12.2 motion or that he may claim self-defense at trial. He further requested the court to prevent the State from playing any recording of the victim discussing prior incidents where Anderson had been charged with domestic violence, OVI, and murder. And finally, he requested the court to prevent the State from eliciting testimony regarding statements that he allegedly made to police officers and that were recorded on the officers' body cameras. He argued the statements were not relevant and were unduly prejudicial.

{¶ 6} The State also filed a motion in limine, asking the court to prevent Anderson from introducing character evidence concerning the victim's prior bad acts.

{¶ 7} The trial court granted Anderson's motion in limine in part with respect to the 911 recording and ordered the State to redact portions of the call. The trial

court also ordered that the victim should not discuss Anderson's prior convictions during her testimony.  But the trial court denied Anderson's motion in limine regarding statements he made to the police.  The trial court tentatively granted the State's motion in limine but said that it would allow the testimony if the State attacked Anderson's credibility.

{¶ 8} Anderson waived his right to a jury trial on Count 2 and elected to have that count tried to the bench.  He also stipulated to his prior domestic-violence conviction for purposes of Count 2.  The remaining counts were tried to a jury where the following evidence was presented.

### A.  The State's Case in Chief

{¶ 9} The victim testified that she and Anderson had been dating since April 2024.  Anderson moved in with her and her 22-year-old son one month after they began dating.  The victim stated that she and Anderson slept in the same bed and had a sexual relationship.

{¶ 10} On August 5, 2024, the victim got home from work around 12:30 a.m.  Her son was sleeping but Anderson was awake and smoking outside.  She went outside and sat by him.  She testified that she thought Anderson had been drinking alcohol because he was not himself.  The victim said that she was not drinking because she took her medication when she got home from work and she is not supposed to drink alcohol when she takes it.

{¶ 11} The victim stated that Anderson got angry with her because she picked up a kitten that had walked up to them. He told her not to take it inside, but she did anyway.

{¶ 12} A short time later, the victim and Anderson were standing in the kitchen. The victim testified that Anderson began talking to her about Cedar Point. He wanted the victim to take him, her son, and three of his children to Cedar Point. The victim told Anderson that it would cost too much to take all of them. She told him that she would take him, her son, and one of his children. She also told Anderson that she was not "obligated to take care of [his] kids."

{¶ 13} The victim testified that she was tired from working all day and began to walk away from him when Anderson told her that she did not like his children. She disagreed and said that she was "just not obligated" to take care of them. The victim testified that she was walking away from Anderson again when he punched her in the back of the head "like a grown man." The victim explained that Anderson first hit her on the right side of her head and then on the left and said, "Bitch, this is what you want." He also said, "You don't even like my fucking kids." She said that she crouched down and covered her head with her hands. When he hit her on the left side of her head, which was the fourth punch, she said that her "blood squirted" on the pantry drawers in the kitchen.

{¶ 14} The victim testified that when she tried to stand up, she lost her balance and was stumbling. She sat down on the couch and called 911. The State played the audio of the 911 recording in court. During the call, the victim was

screaming at Anderson to get out of her house. But Anderson did not leave. Instead, he went into the bathroom and shut the door. She told the 911 operator that she had been assaulted and "bled everywhere."

{¶ 15} The victim said that after Anderson hit her, she began drinking tequila because she had gotten "her ass beat" and wanted to numb the pain. She said that she felt like she had gotten hit with a sledgehammer. When two police officers finally got there, which was around 40 minutes after she called 911, she was intoxicated.

{¶ 16} Around 20 to 25 minutes after police left, the victim's grandmother took her to the hospital. The victim was diagnosed with a concussion, extensive soft-tissue edema, left-side supraorbital subcutaneous hematoma, fractures in the facial bones around her left eye and nose, and issues with her paranasal sinuses because of the fractures. The victim explained that she had to wear sunglasses inside of her house because her eyes were very sensitive. The victim identified photos of her face that the police took on August 5, as well as photos that she took of herself.

{¶ 17} In the following weeks and months, the victim went to counseling. She also followed up with her primary care physician and said that she will likely need to have surgery to correct her crooked nose and deviated nasal septum. The State introduced her medical records from the night of the incident and from her continuing care in the following months.

{¶ 18} On cross-examination, the victim denied that she punched Anderson or laid any hands on him. She agreed that she remained in the house with Anderson until the police arrived.

{¶ 19} Cleveland Police Officer Sean Kiernan testified that he and his partner responded to the victim's 911 call around 4:00 a.m. on August 5. Officer Kiernan said that when the victim came to the door, "her face was a mask of blood . . . there was just blood everywhere on her face . . . [and] [h]er face was very swollen." The victim told them that Anderson was in the bathroom. The officers went to the bathroom and found Anderson "passed out on the toilet" with his cell phone in one hand and a pocketknife in the other. When Anderson woke up, Officer Kiernan said that he appeared to be intoxicated because he had "droopy eyes," "slightly slurred words," and "was slow to respond." Officer Kiernan handcuffed him and took him to the police car. The State played Officer Kiernan's body-camera footage, which depicted him getting Anderson out of the bathroom.

{¶ 20} Officer Kiernan testified that Anderson had blood on his hands. The officers took photographs of Anderson's hands. Officer Kiernan stated that Anderson had scratches on his forearms that did not seem significant and "[s]ome of them looked even older . . . like he got them from working outside." Officer Kiernan identified photos of scratches on Anderson's hands, a torn knuckle, and blood. Officer Kiernan also identified photos of "older" scratches on Anderson's forearms. Officer Kiernan's body-camera footage also showed him checking Anderson's hands. While Officer Kiernan was checking Anderson's hands,

Anderson told Officer Kiernan that the victim "did that on her own." Anderson further stated, "I did not touch her."

{¶ 21} As the officers were walking Anderson outside, Anderson said, "My brother is going to see you." Officer Kiernan asked him if he was threatening the victim. Anderson replied that he was not. As they continued to walk to the police car, Anderson said, "Bang, bang." Officer Kiernan again asked Anderson if that "was a threat." Anderson did not answer.

{¶ 22} The State played Officer Kiernan's body-camera footage that shows Anderson in the back of the police car. Anderson said, "I didn't do nothing." At another point in the recording, Anderson says, "Yeah, it's not her blood, she did that to herself." And then he says, "She crazy as fuck, man." Finally, Anderson says, "I did not touch her. I did not touch her."

{¶ 23} The State also played footage from the police car's "dash cameras." Anderson can be heard saying, "I did not touch her. I did not touch her." A little bit later, he can be heard saying, "She did that shit on her own."

{¶ 24} After Anderson was secured in the police car, Officer Kiernan photographed the victim from different angles. He described what the photos depicted. He said the victim's left eye was severely swollen, and there was blood all over her face and chest. Her right eye was so swollen that it was just a "slit." The victim's nose appeared to be crooked. Officer Kiernan also photographed the victim's hands and knuckles, which were not swollen and did not have any cuts on them. That led Officer Kiernan to believe that she was not the physical aggressor.

The victim then gave the officer her written statement about what occurred that evening.

{¶ 25} When Officer Kiernan was processing Anderson at the police station, Anderson told Officer Kiernan that he wanted photos of the victim so that he could "jack off" to them while he was in jail. The State then played Officer Kiernan's body-camera footage of Anderson making this statement. Anderson also stated, "I didn't do shit."

{¶ 26} The State then played Officer Kiernan's body-camera footage from when Anderson saw a nurse before he was placed in a jail cell. Anderson told the nurse that he was not bleeding and had not been assaulted.

{¶ 27} On cross-examination, Officer Kiernan agreed that in the video footage from his body camera, it appears as if Anderson has three spots of blood on his face. Officer Kiernan stated that he did not photograph the blood because he did not believe that the blood was from an injury on Anderson; he believed that when Anderson hit the victim, her blood splashed onto his face. Officer Kiernan also agreed that there was a slight discoloration on Anderson's face but would not agree that there was the "appearance of a raised bump" on Anderson's face. Officer Kiernan said that he did not address those marks in his report because Anderson did not say that the victim had done anything to him, nor did Anderson tell the officers that he was injured in any way.

{¶ 28} The State also presented Tyler Krotzer, a jail investigator for the Cuyahoga County Sheriff's Department. Krotzer explained that every phone call in

the jail is recorded and monitored. He said the first call that Anderson made while he was in jail was at 7:51 a.m. on August 5, 2024. The call lasted 3 minutes and 27 seconds. In the call, Anderson tells someone on the other line that he was "locked up in the county." The male asked what happened. Anderson replied, "I beat her ass." Anderson explained to the person on the other line that the victim "flipped out" and he "did not have a choice." Anderson further stated, "I think I broke her jaw and [knocked] her motherfucking teeth out of her mouth and shit." Anderson also stated, "We got into a fight. I fucked her up. I fucked her up bad." And finally, Anderson stated, "She pushed me to the limit . . . and then she snitched on me too."

{¶ 29} At the close of the State's case, it moved to dismiss Count 3, strangulation, which the trial court granted. Anderson then moved for all charges to be dismissed pursuant to Crim.R. 29, which the trial court denied.

**B. Anderson's Case in Chief**

{¶ 30} Anderson testified on his own behalf. He said that he moved in with the victim at the end of May 2024, but he denied that they were in a relationship. He said that he and the victim were just roommates. Anderson explained that he had just gotten out of a bad relationship and was not ready to be in another one.

{¶ 31} Anderson testified that before August 5, 2024, there were three instances when the victim had been violent towards him. All three incidents occurred in June 2024. During the second week of June, Anderson said that they had gotten into an argument about vehicles and the victim hit him with a "closed fist" on the right side of his face. He said that his brother witnessed this incident.

{¶ 32} Anderson said the second incident when the victim got violent with him occurred after they had been to a barbeque. The victim was mad at him when they were in the car. He thought she was going to hit him, so he put his hand up to block her and she bit his hand. He said that she bit him so hard that his hand bled. He went to the hospital the following day. He said the medical records were in his storage unit.

{¶ 33} Anderson stated that the third incident where the victim became violent with him also occurred while they were in the car. The victim got mad at him because he was not listening to her so she "punched [him] in the jaw" while he was driving. Anderson said that his son was in the back of the car when it happened.

{¶ 34} Regarding August 5, Anderson testified that when the victim got home from work, she wanted him to drink tequila with her. He said that he had a job interview the following day, so he did not want to drink tequila. He also said that he does not drink liquor because he is a beer drinker. Anderson said that he continued to drink beer while she drank tequila.

{¶ 35} Anderson testified that they began having arguments. They first argued about the kitten. Anderson explained that he had scratches on his arm because the kitten and their cat got into a fight.

{¶ 36} Next, Anderson said they got into an argument about their relationship. According to Anderson, the victim wanted to be with him and continued to get upset that he did not want to be with her. He said that she was also mad that he would not have sex with her. The argument escalated, and the victim

"swung" at him with a "closed fist" and hit his chest. He said that he backed up and told her to chill out, but she "swung again," hitting him in his throat. Anderson got mad and punched the wall. Anderson said that the victim then punched him in his jaw with a "closed fist." He explained that the three punches occurred in a matter of seconds.

{¶ 37} Anderson testified that after the victim punched him for the third time, he snapped. He said he "took off on her." He explained that he punched her because it was a "defensive response." He said the victim was about to punch him for a fourth time. He said, "It was like two dudes going at it. She's really a tomboy."

{¶ 38} Anderson stated that he had a knife in his hand when the police came because he always carries a knife. He said he would not have used the knife against the victim.

{¶ 39} Anderson agreed that he lied to police and told them that he did not hit the victim. He stated that in hindsight, he would have been honest. He stated that he made the comment, "My brother is going to see you," because he wanted his brother to pick up his things. Anderson further explained that he made the comment about "jerking off" to the officers just to "fuck with the people at booking." He said that he was mad that he "was in County."

{¶ 40} Anderson stated that the call he made from jail was to his son. He said that he told his son that he "beat her ass." His son asked why he did it, and Anderson responded, "She flipped like a motherfucker, I had to. We got into a fight; I fucked her up." When asked if he was admitting to his son that he was the

aggressor, he replied, "No, it was self-defense." He further stated that he told his son, "I had to get the fuck out of there, she pushed me to the limit." He explained that he was trying to leave before anything happened, but "[s]he just kept coming."

{¶ 41} Anderson agreed on cross-examination that he never told the police that the victim assaulted him on August 5, 2024. When shown photos of the victim's face taken on August 5, Anderson admitted that he did "this to her." He agreed that it was not "a reasonable response to everything going on."

{¶ 42} Anderson's 15-year-old son testified. He said that his father was living with the victim but that "it was complicated" as to whether they were in a relationship. Anderson's son stated that he was in the back seat of the car in June 2025 when the victim hit his father in the face with a closed fist when his father was driving. He said that after the victim hit his father, he saw his father grab the victim to prevent her from hitting him a second time. On cross-examination, Anderson's son agreed that the victim was his father's girlfriend.

{¶ 43} When Anderson rested his case, he renewed his Crim.R. 29 motion for acquittal, which the trial court again denied.

### C. Verdict and Sentence

{¶ 44} The jury found Anderson guilty of Count 1, felonious assault, and the trial court found Anderson guilty of Count 2, domestic violence. The trial court sentenced Anderson to five to seven and a half years in prison.

## II. Law and Analysis

### A. Manifest Weight of the Evidence

{¶ 45} In his first assignment of error, Anderson argues that his convictions were against the manifest weight of the evidence because the State failed to prove that he acted in self-defense beyond a reasonable doubt.

{¶ 46} When a defendant claims self-defense at trial, the State has the burden of disproving that claim beyond a reasonable doubt. *State v. Messenger*, 2022-Ohio-4562, ¶ 1.

{¶ 47} A self-defense claim includes the following elements:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶ 48} Prior to March 28, 2019, a defendant had the burden of proving these elements by a preponderance of the evidence. *Messenger* at ¶ 15. But after the General Assembly passed Am.Sub.H.B. No. 228, which became effective in March 2019, the prosecution must now prove beyond a reasonable doubt that the accused person did not act in self-defense. *Id.* But "[s]elf-defense remains an affirmative defense in Ohio," and H.B. 228 "did not eliminate the defendant's burden of production regarding a claim of self-defense." *Id.* at ¶ 24, ¶ 27.

{¶ 49} When a defendant claims on appeal that the State failed to meet its new burden of disproving the defendant's self-defense claim beyond a reasonable doubt, we apply a manifest-weight standard of review. *Id.* at ¶ 27. The appellate court

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

{¶ 50} Anderson claims that the jury lost its way because it was clear from the evidence presented at trial that he had a history of being abused by the victim and that even the victim admitted to previously abusing him. In support of his argument, he asserts that the evidence "was clear" that (1) the victim "came home and began imbibing alcohol," (2) the victim "was clearly attacking [him] with a closed fist," (3) "it was obvious that given the history of domestic abuse between the two parties, he felt the only way to stop the abuse was to react by physically hitting her," and (4) the officer's testimony demonstrated that he had injuries on the day in question.

{¶ 51} Our independent review of the testimony does not support Anderson's claims. While he did testify to previous incidents where the victim

punched him on two occasions and bit him once, the victim did not admit or agree that she had done those things. In fact, our review of the transcript where Anderson claims the victim "acquiesced that she had previously been abusive towards Anderson," supports just the opposite. Anderson cites page 397 of the transcript in support of his claim that the victim admitted that she had previously been abusive towards him. But on that page, the victim denied that she punched Anderson, denied that she scratched him, and denied that she put her hands on him. She never admitted or agreed that she had been abusive towards Anderson — in the past or on August 5, 2024.

{¶ 52} Anderson further claims that the evidence established that the victim came home from work and began drinking alcohol immediately. He argues that the officer's testimony that the victim was intoxicated supports this claim. The victim testified that she did not begin drinking until after Anderson punched her. She stated that she felt like she had gotten hit with a sledgehammer and wanted to numb her pain. She admitted that she was intoxicated by the time the police arrived. Thus, the evidence is conflicting on whether she began drinking before or after Anderson punched her. But even if we agreed with Anderson that the evidence established that the victim began drinking before he abused her, the evidence established that he was intoxicated when the police arrived. And even if we believed Anderson that the victim had started drinking before he physically assaulted her, that does not establish that she "punched him with a closed fist" on August 5, 2024.

{¶ 53} After reviewing the evidence presented at trial, we conclude that the State met its burden beyond a reasonable doubt of disproving that Anderson acted in self-defense. Indeed, the State's evidence against Anderson was overwhelming. Officer Kiernan testified that Anderson did not complain of any injuries on the night of August 5, 2024. Although Anderson had a few spots of blood on his face, the officer stated that he thought it was from blood splatter that occurred when Anderson hit the victim. Officer Kiernan also testified that Anderson's knuckle had a tear on it and his hands had scratches on them, which indicated to the officer that Anderson was the aggressor. Moreover, the victim did not have any cuts on her hands, which led Officer Kiernan to believe that she was not the aggressor. Anderson also told an intake nurse at the jail that he had not been assaulted and was not bleeding anywhere.

{¶ 54} The State also entered several videos taken from police-body cameras and the dash camera in the police car. Anderson told police on the night of August 5, 2024, that he did not touch the victim. But he admitted at trial that he lied to police. He also made a call to his son from jail where he stated that he beat the victim's ass and "fucked her up good."

{¶ 55} Further, the officers took photos of the victim's injuries as well as photos of blood throughout the kitchen, where the victim said Anderson had punched her. The victim's eyes were extremely swollen, and she had blood all over her face. The State also entered the victim's medical records into evidence. She had a broken left eye socket and a broken nose as well as other medical issues that are

ongoing. She will likely require surgery in the future to fix her deviated nasal septum caused by the fractures.

{¶ 56} After reviewing the entire record, we conclude that this is not "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thomkins*, 78 Ohio St.3d at 390, quoting *Martin,* 20 Ohio App.3d at 175.

{¶ 57} Accordingly, we overrule Anderson's first assignment of error.

### B. **Mistrial**

{¶ 58} In his second assignment of error, Anderson argues that the trial court erred when it denied his motion for mistrial. He contends the trial court should have granted his motion because the victim's "testimony included a reference to [his] prior arrests and times in jail."

{¶ 59} During the victim's testimony, the State asked her how things were going with Anderson after he moved in with her. She responded:

> It was okay, but he ended up getting a job, and I was letting him drive my other car, because I have three vehicles, so he could be able to get back and forth to work. And he could never keep the job. My car ended up — he had like — he had the job, my car ended up getting impounded twice in one week. I had to get my car out of the impound, as well as get him out of impound — you know, out of jail.

{¶ 60} Anderson immediately objected. The court sustained the objection and instructed the jury to "disregard any mentions from the witness that she had to get the defendant out of jail."

{¶ 61} "A mistrial is an extreme remedy which is only warranted in circumstances where a fair trial is no longer possible[,] and [a] mistrial is required

to meet the ends of justice." *State v. McCree*, 2007-Ohio-268, ¶ 38 (8th Dist.), citing *State v. Jones*, 83 Ohio App.3d 723, 737 (2d Dist. 1992); *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

{¶ 62} It is within a trial court's sound discretion to decide whether to grant or deny a mistrial. *State v. Cepec*, 2016-Ohio-8076, ¶ 89, citing *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). A reviewing court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice. *State v. Sage*, 31 Ohio St.3d 173, 182 (1987).

{¶ 63} In *Garner*, the Ohio Supreme Court found that the trial court did not abuse its discretion by failing to order a mistrial where an improper reference to the defendant's prior arrests was fleeting and was promptly followed by a curative instruction. *Id.*; *see also State v. Trimble*, 2009-Ohio-2961, ¶ 174-175. This court has also concluded that where a witness makes an isolated reference to a defendant's criminal history and there is no showing that the defendant suffered material prejudice, a mistrial is not warranted. *State v. Conner*, 2014-Ohio-601, ¶ 92 (8th Dist.); *State v. Payne*, 2018-Ohio-1399, ¶ 20 (8th Dist.) (mistrial unnecessary because the disclosure of the criminal history was brief and unspecific despite the lack of a curative instruction).

{¶ 64} In this case, the witness's reference to having to get the defendant out of jail was fleeting and did not materially prejudice Anderson. Moreover, the trial court promptly gave a curative instruction to the jury. A jury is presumed to follow curative instructions given to it by a trial judge. *State v. Loza*, 71 Ohio St.3d 61, 75

(1994), citing *State v. Henderson*, 39 Ohio St.3d 24, 33 (1998). Thus, we find no merit to Anderson's argument.

{¶ 65} Anderson's second assignment of error is overruled.

**C. Medical Records**

{¶ 66} In his third assignment of error, Anderson argues that the trial court erred when it permitted the State, over his objection, to introduce medical records of the victim's "continuing medical treatment" at MetroHealth. Anderson does not assert that the records were not relevant or not properly authenticated. Rather, he maintains that the State failed to give him the required written notice prior to trial as required by Evid.R. 902(11).

{¶ 67} It is well established that the introduction of evidence at trial falls within the sound discretion of the trial court. Evid.R. 104; *State v. Heinish*, 50 Ohio St.3d 231, 239 (1990). Therefore, a reviewing court must limit its review to whether the lower court abused its discretion. *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989). Moreover, any error on the part of the trial court in admitting or excluding evidence does not warrant reversal unless the ruling affected the substantial rights of the complaining party. Evid.R. 103(A).

{¶ 68} Evid.R. 902(11) provides in relevant part that if a proponent intends to admit certified business records into evidence at trial, it "must give the adverse party reasonable written notice of the intent to offer the record — and must make the record and certification available for inspection — so that the party has a fair opportunity to challenge them."

{¶ 69} During the victim's testimony, the State asked her to identify her medical records from the Cleveland Clinic from the night of August 5, 2024, and from continuing treatment that she had at MetroHealth in the following months. Anderson objected only to the MetroHealth records because of the fact that the State failed to give him the required notice under Evid.R. 902(11). The State argued that it gave a complete copy of the certified MetroHealth records to Anderson on October 30, 2024, as part of the State's written discovery responses. The State also argued that it included the MetroHealth records on its exhibit list prior to trial. The trial court admitted the records over Anderson's objection.

{¶ 70} We find no error on the part of the trial court. The MetroHealth records were properly authenticated by the victim under Evid.R. 901(B). The records were also properly certified and, therefore, were self-authenticating pursuant to Evid.R. 901(B)(1) and R.C. 2317.422. *See In re R.H.*, 2023-Ohio-78, ¶ 67-68. The State provided the certified MetroHealth records to Anderson five months before trial. Anderson had substantial time to inspect the records and an opportunity to challenge them.

{¶ 71} Even if we agreed with Anderson that the trial court erred in admitting the MetroHealth records because of insufficient notice, we would not reverse Anderson's convictions because any purported error did not affect Anderson's substantial rights. Evid.R. 103(A). As we previously explained, the State's evidence against Anderson was overwhelming.

**{¶ 72}** Accordingly, we find no merit to Anderson's third assignment of error and overrule it.

**{¶ 73}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)